## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JASON LEOPOLD,

BUZZFEED, INC.,

*Plaintiffs,*

v.                                                     Civil Action No.  1:18-cv-2567-BAH

FEDERAL BUREAU OF
INVESTIGATION,

*Defendant.*

## DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)     I am currently the Section Chief of the Record/Information Dissemination Section

("RIDS"), Information Management Division ("IMD"), in Winchester, Virginia.  I have held this

position since August 1, 2002.  Prior to joining the Federal Bureau of Investigation ("FBI"), from

May 1, 2001, to July 31, 2002, I was the Assistant Judge Advocate General of the United States

Navy for Civil Law.  In that capacity, I had direct oversight of Freedom of Information Act

("FOIA") policy, procedures, appeals, and litigation for the Navy.  From October 1, 1980, to April

30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with

FOIA matters.  I am also an attorney who has been licensed to practice law in the State of Texas

since 1980.

(2)     In my official capacity as Section Chief of RIDS, I supervise approximately 242

FBI employees, supported by approximately 74 contractors, who staff a total of  twelve (12) FBI

Headquarters ("FBIHQ") units and two (2) field operational service center units whose collective

mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI

records and information pursuant to the FOIA, as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and the FOIA Improvement Act of 2016; the Privacy Act of 1974; Executive Order 13526; Presidential, Attorney General and FBI policies and procedures; judicial decisions; and other Presidential and Congressional directives.  My responsibilities also include the review of FBI information for classification purposes as mandated by E.O. 13526, 75 Fed. Reg. 707 (2010), and the preparation of declarations in support of Exemption 1 claims asserted under the FOIA.  I have been designated by the Attorney General of the United States as an original classification authority and a declassification authority pursuant to E.O. 13526, §§ 1.3 and 3.1. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a, and specifically, I am familiar with the FBI's handling of Plaintiffs' FOIA requests related to the supplemental background investigation of then-Judge Brett Kavanaugh[1] that are at issue in this litigation.

(4)     In this case, the FBI processed a total of 2,579 pages of responsive records subject to the FOIA.  Of these pages, the FBI released 23 pages in full, released 2,029 pages in part, and withheld 527 pages in full for the following reasons: the pages were exempt in full pursuant to one or more applicable FOIA exemptions and the pages were found to be duplicative of other pages accounted for elsewhere in the FBI's production.  In accordance with *Vaughn v. Rosen*, 424 F.2d

---

[1]Because the FBI's supplemental background investigation took place before Justice Kavanaugh's nomination to the Supreme Court was confirmed, the Justice is referred to herein as Judge Kavanaugh.

820 (D.C. Cir. 1973), this declaration is being submitted in support of Defendant's Motion for Summary Judgment. It summarizes the administrative history of Plaintiffs' FOIA requests; describes the FBI's searches for responsive records; and explains the FBI's rationale for withholding certain information pursuant to FOIA Exemptions (b)(3), (b)(7)(A), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E). It also explains the basis for asserting Exemption (b)(5), in conjunction with the presidential communications privilege, over the supplemental background investigation file on Judge Kavanaugh following consultation with the Department of Justice ("DOJ") and White House Counsel's Office ("WHCO").

## HISTORY OF PLAINTIFFS' FOIA REQUESTS

### REQUEST #1
### FOIPA REQUEST No. 1418863-000

(5)     Plaintiffs submitted a two-part request to the FBI on October 5, 2018 requesting the following:

> 1. A copy of the final report sent to the White House and the Senate Judiciary Committee on either October 3 or October 4, 2018 on Supreme Court nominee Brett Kavanaugh.
>
> 2. All interview notes; investigative notes; FD-302s relating or referring to the FBI investigation into allegations leveled against Judge Kavanaugh.

In addition, Plaintiffs requested expedited processing and waiver of fees associated with this request. *See* **Exhibit A**, hereafter "Request #1."

(6)     The FBI sent Plaintiffs a series of letters on October 11, 2018, concerning this request.

(a)     First, the FBI acknowledged receipt of Request #1 and assigned it FOIPA Request No. 1418863-000. The FBI also confirmed receipt of Plaintiffs' fee waiver request and advised Plaintiffs the request was under consideration. *See* **Exhibit B**.

- 3 -

(b)    Second, the FBI notified Plaintiffs that "unusual circumstances" applied to their request pursuant to 5 U.S.C. § 552(a)(6)(B)(iii), which permits agencies to extend by 10 days the period during which requesters must be notified whether the agency will comply with a FOIA request. *See* **Exhibit C.**

(c)    Third, the FBI advised Plaintiffs that their request for expedited processing was approved, pursuant to 28 C.F.R. § 16.5(e)(1)(ii). *See* **Exhibit D.**

**REQUEST #2**
**FOIPA REQUEST No. 1418859-000**

(7)    Plaintiffs submitted a four-part request to the FBI on October 6, 2018, requesting the following:

> 1. All submissions to the FBI tip line, FBI web portal and emails to FBI Headquarters relating or referring to Supreme Court nominee Brett Kavanaugh, allegations leveled against him referring to sexual assault, his character, his drinking, Georgetown Prep, his years as a high school student and college student, requests by individuals to be interviewed by the FBI. In a tweet on Thursday evening October 2, 2018, Senator Ed Markey stated:
>
>> I just reviewed the FBI's #Kavanaugh report. The FBI never interviewed many relevant witnesses. There are also thousands of pages of leads from the time line that received no follow up. It's clear the White House wanted the FBI to go through the motions & that's what it did.
>
> I request these records that Senator Markey has referred to. The FBI may redact the personable identifiable information of the senders and non-public figures.
>
> 2. All correspondence between the FBI and any individual who submitted a tip about Judge Kavanaugh to the FBI through the web portal, emails and/or tip line.
>
> 3. All records, which includes but is not limited to emails, memos, and letters, between FBI personnel who mentioned or referred to these submissions as part of the investigation into his background as the bureau was instructed to undertake by the White House and Senate Judiciary Committee.

- 4 -

4. All correspondence between the FBI and the Department of Justice relating or referring to the FBI's investigation into any allegations leveled against Brett Kavanaugh by his accusers.

In addition, Plaintiffs requested expedited processing and waiver of fees associated with this request. *See* **Exhibit E**, hereafter "Request #2."

(8)    The FBI sent Plaintiffs a series of letters on October 11, 2018, concerning this request.

(a)    First, the FBI acknowledged receipt of Request #2 and assigned it FOIPA Request No. 1418859-000. The FBI also confirmed receipt of Plaintiffs' fee waiver request and advised Plaintiffs the request was under consideration. *See* **Exhibit F**.

(b)    Second, the FBI notified Plaintiffs that "unusual circumstances" applied to their request pursuant to 5 U.S.C. § 552(a)(6)(B)(iii). *See* **Exhibit G.**

(c)    Third, the FBI advised Plaintiffs that their request for expedited processing was approved, pursuant to 28 C.F.R. § 16.5(e)(1)(ii). *See* **Exhibit H.**

### REQUEST #3
### FOIPA REQUEST NO. 1418851-000

(9)    Plaintiffs submitted a two-part request to the FBI on October 6, 2018, requesting the following:

1. A copy of the final report sent to the White House and the Senate Judiciary Committee on either October 3 or October 4, 2018 on Supreme Court nominee Brett Kavanaugh.

2. All interview notes; investigative notes; FD-302s relating or referring to the FBI investigation into allegations leveled against Judge Kavanaugh.

In addition, Plaintiffs requested expedited processing and waiver of fees associated with this request. *See* **Exhibit I**, hereafter "Request #3." This request is a duplicate of Request #1, with the

exception that this request states that Plaintiffs seek both investigative and non-investigative records.

(10)   The FBI sent Plaintiffs a series of letters on October 11, 2018, concerning this request.

(a)   First, the FBI acknowledged receipt of Request #3 and assigned it FOIPA Request No. 1418851-000.  The FBI also confirmed receipt of Plaintiffs' fee waiver request and advised Plaintiffs the request was under consideration.  *See* **Exhibit J**.

(b)   Second, the FBI notified Plaintiffs that "unusual circumstances" applied to their request pursuant to 5 U.S.C. § 552(a)(6)(B)(iii).  *See* **Exhibit K**.

(c)   Third, the FBI advised Plaintiffs that their request for expedited processing was approved, pursuant to 28 C.F.R. § 16.5(e)(1)(ii).  *See* **Exhibit L**.

**REQUEST #4**
**FOIPA REQUEST NO. 1418878-000**

(11)   Plaintiffs submitted a request to the FBI on October 6, 2018, requesting the following:

> 1. A copy of all paper submissions made to the FBI by relating or referring to Supreme Court nominee Brett Kavanaugh and any accusations leveled against him about his conduct, his character, his behavior [and any] records attesting to his character.  By paper submissions, I am referring to letters mailed [and] shipped to FBI and certified letters including those letters submitted by third parties such as law firms.

*See* **Exhibit M**, hereafter "Request #4."

(12)   The FBI sent Plaintiffs a series of letters on October 11, 2018, concerning this request.

(a)   First, the FBI acknowledged receipt of Request #4 and assigned it FOIPA Request No. 1418878-000.  The FBI also confirmed receipt of Plaintiffs' fee waiver request and

advised Plaintiffs the request was under consideration. *See* **Exhibit N**.

      (b)    Second, the FBI notified Plaintiffs that "unusual circumstances" applied to their request pursuant to 5 U.S.C. § 552(a)(6)(B)(iii). *See* **Exhibit O**.

      (c)    Third, the FBI advised Plaintiffs that their request for expedited processing was approved, pursuant to 28 C.F.R. § 16.5(e)(1)(ii). *See* **Exhibit P**.

    (13)    Plaintiffs filed this suit on November 7, 2018, and subsequently amended their Complaint on December 7, 2018. *See* Compl., ECF No. 1; Am. Compl., ECF No. 6. The subject of the initial Complaint was an October 4, 2018, FOIA request by Plaintiffs, which the FBI had assigned FOIPA Request No. 1418186-000. *See* Compl. ¶¶ 6-7. That request is identical to FOIPA Request No. 1418863-000. *Compare id.* ¶ 6, *with* Am. Compl. ¶ 6. The Amended Complaint does not raise any allegations as to FOIPA Request No. 1418186-000.

    (14)    By letter dated May 3, 2019, the FBI made its first interim release of records to Plaintiffs. This release consisted of records of tips received by the FBI. The FBI reviewed 505 pages and released 482 pages in full or in part, with certain information withheld pursuant to FOIA Exemptions (b)(6), (b)(7)(A), (b)(7)(C), and (b)(7)(E). *See* **Exhibit Q**.

    (15)    By letter dated June 7, 2019, the FBI made its second interim release of tip records to Plaintiffs. The FBI reviewed and released 517 pages in full or in part, with certain information withheld pursuant to FOIA Exemptions (b)(6), (b)(7)(A), (b)(7)(C), and (b)(7)(E). *See* **Exhibit R**.

    (16)    By letter dated July 11, 2019, the FBI made its third interim release of tip records to Plaintiffs. The FBI reviewed and released 514 pages in full or in part, with certain information withheld pursuant to FOIA Exemptions (b)(6), (b)(7)(C), and (b)(7)(E). *See* **Exhibit S**.

    (17)    By letter dated August 7, 2019, the FBI made its final release of tip records to Plaintiffs in this litigation. The FBI reviewed and released 516 pages in full or in part, with certain

information withheld pursuant to FOIA Exemptions (b)(3), (b)(6), (b)(7)(A), (b)(7)(C), and (b)(7)(E). As part of this response, the FBI further advised Plaintiffs the supplemental background investigation file on Judge Kavanaugh, consisting of 527 pages, was being withheld in full pursuant to Exemption (b)(5) in conjunction with the presidential communications privilege, and that the FBI was also protecting portions of that file pursuant to FOIA Exemptions (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E). *See* **Exhibit T.**

(18)    After the FBI completed its August 7, 2019, production, the parties again conferred, and Plaintiffs agreed not to seek additional records responsive to their requests for submissions to the FBI tip-line. With FBI's productions complete, the parties proposed—and the Court adopted— a schedule for cross-motions for summary judgment.

## FBI'S SEARCHES FOR RESPONSIVE RECORDS

(19)    As described below, the FBI searched multiple locations in order to locate records responsive to Plaintiffs' requests. The FBI searched its Central Records System ("CRS") to locate the supplemental background investigation file and any other responsive records that may be included in the system. The FBI searched its Criminal Justice Information Services ("CJIS") Division for records about tips received by the FBI. The FBI searched its Office of Public Affairs ("OPA"), Office of Congressional Affairs ("OCA"), and Office of the Executive Secretariat ("ExecSec"), for any records that those offices might maintain related to the supplemental background investigation. Finally, the FBI searched its Security Division ("SecD"), which conducted the supplemental background investigation. The FBI concluded that these were the locations/offices within the FBI likely to maintain responsive records, and that no other locations or offices were likely to maintain responsive records.

## SEARCH #1: CENTRAL RECORDS SYSTEM

### *BACKGROUND ON THE CENTRAL RECORDS SYSTEM*

(20)     The Central Records System ("CRS") is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI in the course of fulfilling its integrated missions and functions as a law enforcement, counterterrorism, and intelligence agency to include performance of administrative and personnel functions. The CRS spans the entire FBI organization and encompasses the records of FBI Headquarters ("FBIHQ"), FBI Field Offices, and FBI Legal Attaché Offices ("Legats") worldwide.

(21)     The CRS consists of a numerical sequence of files, called FBI "classifications," which are organized according to designated subject categories. The broad array of CRS file classification categories include types of criminal conduct and investigations conducted by the FBI, as well as categorical subjects pertaining to counterterrorism, intelligence, counterintelligence, personnel, and administrative matters. For identification and retrieval purposes across the FBI, when a case file is opened, it is assigned a Universal Case File Number ("UCFN") consisting of three sequential components: (a) the CRS file classification number, (b) the abbreviation of the FBI Office of Origin ("OO") initiating the file, and (c) the assigned individual case file number for that particular subject matter.[2] Within each case file, pertinent documents of interest are "serialized," or assigned a document number in the order in which the document is added to the file, typically in chronological order.

---

[2] For example, in a fictitious file number of "11Z-HQ-56789;" the "11Z" component indicates the file classification, "HQ" indicates that FBI Headquarters is the FBI OO of the file, and "56789"is the assigned case specific file number.

The CRS General Indices and Indexing

(22)   The general indices to the CRS are the index or "key" to locating records within the enormous amount of information contained in the·CRS.   The CRS is indexed in a manner which meets the FBI's investigative needs and priorities, and allows FBI personnel to reasonably and adequately locate pertinent files in the performance of their law enforcement duties.   The general indices are arranged in alphabetical order and comprise an index on a variety of subject matters to include individuals, organizations, events, or other subjects of investigative interest that are indexed for future retrieval.   The entries in the general indices fall into two category types:

    a.  Main entry.   A main index entry is a created for each individual or non-individual that is the subject or focus of an investigation.   The main subject(s) are identified in the case title of most documents in a file.

    b.  Reference entry.   A reference index entry is created for individuals or non-individuals associated with the case but are not the main subject(s) or focus of an investigation.   Reference subjects are typically not identified in the case title of a file.

(23)   FBI employees may index information in the CRS by individual (persons), by organization (organizational entities, places, and things), and by event (e.g., a terrorist attack or bank robbery).   Indexing information in the CRS is done at the discretion of FBI investigators when information is deemed of sufficient significance to warrant indexing for future retrieval.   Accordingly, the FBI does not index every individual name or other subject matter in the general indices.

### AUTOMATED CASE SUPPORT SYSTEM AND THE UNIVERSAL INDEX

(24)   Automated Case Support ("ACS") was an electronic, integrated case management system that became effective for FBIHQ and all FBI Field Offices and Legats on October 1, 1995.   As part of the ACS implementation process, over 105 million CRS records were converted from automated systems previously utilized by the FBI into a single, consolidated case management

system accessible by all FBI offices.  ACS had an operational purpose and design to enable the
FBI to locate, retrieve, and maintain information in its files in the performance of its myriad
missions and functions.[3]

(25)    The Universal Index ("UNI") was the automated index of the CRS and provided all
offices of the FBI a centralized, electronic means of indexing pertinent investigative information
to FBI files for future retrieval via index searching.  Individual names were recorded with
applicable identifying information such as date of birth, race, sex, locality, Social Security
Number, address, and/or date of an event.  Moreover, ACS implementation built upon and
incorporated prior automated FBI indices; therefore, a search employing the UNI application of
ACS encompassed data that was already indexed into the prior automated systems superseded by
ACS.  As such, a UNI index search in ACS was capable of locating FBI records created before its
1995 FBI-wide implementation in both paper and electronic format.[4]

Sentinel

(26)    Sentinel is the FBI's next generation case management system that became
effective FBI-wide on July 1, 2012.  Sentinel provides a web-based interface to FBI users, and it
includes the same automated applications that were utilized in ACS.  After July 1, 2012, all FBI
generated records are created electronically in case files via Sentinel; however, Sentinel did not
replace ACS and its relevance as an important FBI search mechanism.  Just as pertinent
information was indexed into UNI for records generated in ACS before July 1, 2012, when a record

---

[3] ACS was and the next generation Sentinel system is relied upon by the FBI daily to fulfill
essential functions such as conducting criminal, counterterrorism, and national security
investigations; background investigations; citizenship and employment queries, and security
screening, to include Presidential protection.
[4] Older CRS records that were not indexed into UNI as a result of the 1995 ACS consolidation
remain searchable by manual review of index cards, known as the "manual indices."

is generated in Sentinel, information is indexed for future retrieval. Additionally, in the time frame

in which both systems were in operation, any information indexed within Sentinel was backfiled

in ACS.

(27)    On August 1, 2018, the ACS case management system was decommissioned and

ACS data was migrated into Sentinel, including the ACS indices data and digitized investigative

records formerly available in ACS. Moreover, Sentinel retains the index search methodology and

function whereby the CRS is queried via Sentinel for pertinent index main or reference entries in

case files. All CRS index data from the UNI application previously searched via ACS is now

searched through the "ACS Search" function within Sentinel.

(28)    Because ACS was still operational at the time the FBI conducted searches for

Plaintiffs' requests, RIDS practice was to begin its FOIPA searching efforts by conducting an

index search via ACS/UNI. When appropriate (when records were reasonably expected to have

been created on or after July 1, 2012), RIDS then built on its ACS index search by conducting an

index search of Sentinel records to ensure it captured all relevant data indexed after the

implementation of Sentinel. These two index searches, in most cases represented the most

reasonable means for the FBI to locate records potentially responsive to FOIPA requests. This is

because these automated indices offered access to a comprehensive, agency-wide set of indexed

data on a wide variety of investigative and administrative subjects. Currently, the FBI's automated

indices consist of millions of searchable records and are updated daily with material newly indexed

in Sentinel.

(29)    Additionally, it is important to note the location of records indexed to the subject

of a FOIPA request does not automatically mean the indexed records are responsive to the subject.

Index searches are the means by which potentially responsive records are located, but ultimately,

- 12 -

a FOIPA analyst must consider potentially responsive indexed records against the specific parameters of individual requests. Responsiveness determinations are made once indexed records are gathered, analyzed, and sorted by FOIPA analysts who then make informed scoping decisions to determine the total pool of records responsive to an individual request.

### CRS SEARCH METHODOLOGY GENERALLY

(30)    To locate CRS information, RIDS employs an index search methodology. Index searches of the CRS are reasonably expected to locate responsive material within the vast CRS since the FBI indexes pertinent information into the CRS to facilitate retrieval to serve its primary law enforcement and intelligence gathering functions. Given the broad range of indexed material in terms of both time frame and subject matter that it can locate in FBI files, the FBI automated indices available at the time of Plaintiffs' request in both ACS and Sentinel was the mechanism RIDS employed to conduct CRS index searches.

### CRS SEARCH AND RESULTS

(31)    In response to Plaintiffs' requests, RIDS conducted a CRS index search for potentially responsive records employing the ACS/UNI and the Sentinel automated indices. Specifically, the FBI conducted a CRS indices search, for both main files and references, using the term "Brett Kavanaugh" to locate records responsive to Plaintiffs' requests. The FBI maintains its background investigation files in the CRS, and any such files would be located through a query of the indices of the CRS, using Judge Kavanaugh's name. As a result of this search, the FBI located the supplemental background investigation file on Judge Kavanaugh. Within the file, the FBI located records responsive to Plaintiffs' requests.

### SEARCH #2: CRIMINAL JUSTICE INFORMATION SERVICES DIVISION

(32)    Among other responsibilities, the FBI's Criminal Justice Information Services Division ("CJIS") manages, ingests, and routes public tips received through the FBI's Public Access Line ("PAL") and E-Tip, the FBI's public online platform where the public can submit investigative tips electronically. Both PAL and E-Tip tips are stored within CJIS's Public Access Line Manager ("PALM") database. To respond to Plaintiffs' request for tip line information related to Judge Kavanaugh, CJIS searched for the terms "Brett" and "Kavanaugh" within its PALM system and provided RIDS with all responsive tip records, received both telephonically or electronically, located through this search.

### SEARCH #3: OFFICE OF PUBLIC AFFAIRS

(33)    The FBI's Office of Public Affairs ("OPA") is responsible for liaising with the media; making direct contact with the public through the internet, speeches, reports, and community outreach activities; and sharing information with the public about the FBI's the FBI's responsibilities, operations, accomplishments, policies, and values. As such, RIDS deemed it possible OPA possessed records related to public submissions of information related to Judge Kavanaugh and/or records regarding FBI communications with the public concerning its supplemental background investigation of Judge Kavanaugh. Plaintiffs' FOIA requests were provide to OPA, which disseminated them to employees familiar with the subject matter. These employees searched records in OPA's possession for any responsive records, relying on Plaintiffs' FOIA requests. As a result of these efforts, OPA located a news article regarding FBI Director Wray's testimony before the Senate regarding the FBI's supplemental background investigation of Judge Kavanaugh.

## SEARCH #4: OFFICE OF CONGRESSIONAL AFFAIRS

(34)     The FBI's Office of Congressional Affairs ("OCA") is the FBI's primary liaison with Congress and plays a key role in communicating with lawmakers about FBI activities. OCA's mission is to enhance Congressional confidence in the FBI through the disclosure of information about the mission, accomplishments, operations, and values of the organization by interacting directly with the FBI's Congressional Oversight Committees, Members, and staff. As such, the RIDS deemed it possible that OCA would possess records of communications between the FBI and Congress that would be responsive to Plaintiffs' FOIA requests. Plaintiffs' FOIA requests were provide to OCA, which disseminated them to employees familiar with the subject matter. These employees searched records in OCA's possession for any responsive records, relying on Plaintiffs' FOIA requests. OCA located one e-mail record regarding a Senate inquiry into the FBI's supplemental background investigation of Judge Kavanaugh.

## SEARCH #5: OFFICE OF THE EXECUTIVE SECRETARIAT

(35)     The FBI's Office of the Executive Secretariat ("ExecSec") serves the FBI, DOJ, and others by managing executive-level and public correspondence and communications. ExecSec manages the FBI Director's correspondence and communications, and stores such information in an internal database. ExecSec also ensures that the FBI responds promptly and accurately to inquiries from a variety of correspondents, to include members of the executive, legislative, and judicial branches of the U.S. government; representatives of local, state, and federal law enforcement; and the general public. Accordingly, RIDS deemed it possible that ExecSec may maintain records responsive to Plaintiffs' FOIA requests. RIDS provided copies of Plaintiffs' FOIA requests to ExecSec, which searched its internal database for any responsive records, based on Plaintiffs' FOIA requests. ExecSec did not locate any responsive records.

### SEARCH #6: SECURITY DIVISION

(36)    Among other responsibilities, the FBI's Security Division ("SecD") provides timely, accurate, and comprehensive background investigations on individuals nominated for Presidential appointments, such as Supreme Court Justice nominees.  Indeed, the supplemental background investigation file on Judge Kavanaugh located in the CRS was created and compiled by SecD.  Normally, once an official investigative file is located in the CRS, the FBI does not conduct additional searches of the investigating division or office.  Here, however, RIDS contacted SecD in an abundance of caution to ensure that it had located all responsive records.  SecD confirmed that all information compiled by SecD during its supplemental background investigation of Judge Kavanaugh was maintained in the supplemental background investigation file located in the CRS.

* * *

(37)    As demonstrated above, RIDS conducted searches reasonably calculated to locate records responsive to Plaintiffs' requests.  First, given its comprehensive nature and scope, the CRS is the principal records system searched by RIDS to locate information responsive to most FOIPA requests, because the CRS is where the FBI indexes information about individuals, organizations, events, and other subjects of investigative interest for future retrieval.  Second, given Plaintiffs' requests sought information about Judge Kavanaugh, such information would reasonably be expected to be located in the CRS via the index search methodology.  Here, the CRS search was supplemented by searches of other FBI divisions and offices likely to possess responsive records – i.e., CJIS, OPA, OCA, ExecSec, and SecD.  Through its CRS search and these supplemental targeted searches, RIDS searched all locations where FBI records responsive

to Plaintiffs' requests could reasonably be expected to be maintained. Furthermore, the FBI found

no indication that responsive records are likely to be maintained in any other locations.

## JUSTIFICATION FOR NONDISCLOSURE UNDER THE FOIA

(38)    All records responsive to Plaintiffs' requests were processed to achieve maximum

disclosure consistent with the access provisions of the FOIA. Every effort was made to provide

Plaintiffs with all material in the public domain as well as all non-exempt information in the

records responsive to the request for the tip submissions. The FBI reviewed 2,029 pages of

responsive records it located through its searches for tip records, which have been Bates-numbered

sequentially – "18-cv-02567-1" through "18-cv-02567-2029" – for ease of reference. The FBI

conducted a document-by-document, line-by-line review of the records, and ultimately released to

Plaintiffs 2,029 pages of responsive, non-exempt records. The FBI protected exempt information

pursuant to FOIA Exemptions (b)(3), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E). Further

description of the information withheld, beyond what is provided in this declaration, could identify

the actual exempt information the FBI has protected. After consulting with DOJ and WHCO, the

FBI also withheld the supplemental background investigation file in full pursuant to Exemption

(b)(5) and the presidential communications privilege. These documents are represented by Bates

pages "18-cv-02567-2030" through "18-cv-02567-2579." As described below, WHCO

determined all records within the supplemental background investigation file meet the threshold

requirements of the presidential communications privilege, and the entirety of the supplemental

background investigation file qualified for withholding under Exemption (b)(5). The FBI also

asserted Exemptions (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E) to withhold certain information

within the supplemental background investigation file. The FBI has attached a *Vaughn* Index

which provides the Court and Plaintiffs further description of the records reviewed by the FBI. *See* **Exhibit U.**

(39)    The Bates-numbered documents contain, on their face, coded categories of exemptions which detail the nature of the information withheld pursuant to the provisions of the FOIA. The coded categories are provided to aid the Court's and Plaintiffs' review of the FBI's explanations of FOIA exemptions used to withhold information. The coded, Bates-numbered pages together with this declaration and attached *Vaughn* index demonstrate all material withheld by the FBI is exempt from disclosure pursuant to the cited FOIA exemptions, or, with respect to the tip records, is so intertwined with protected material that segregation is not possible without revealing the underlying protected material. The coded pages will be provided at the Court's request.

(40)    Each instance of information withheld on the Bates-numbered documents is accompanied by a coded designation that corresponds to the categories listed below. For example, if "(b)(7)(C)-1" appears on a document, the "(b)(7)(C)" designation refers to FOIA Exemption (b)(7)(C) protecting against unwarranted invasions of personal privacy. The numerical designation of "1" following the "(b)(7)(C)" narrows the main category into a more specific subcategory, such as "Names and/or Identifying Information of FBI Special Agents and Professional Staff."

(41)    The following chart lists and summarizes the coded categories used in this case:

| CODED CATEGORIES | INFORMATION WITHHELD |
| --- | --- |
| **EXEMPTION (b)(3)** | **INFORMATION PROTECTED BY STATUE** |
| (b)(3)-1 | National Security Act of 1947, 50 U.S.C. § 3024(i)(1) |
| **EXEMPTION (b)(5)** | **PRIVILEGED INFORMATION** |

| (b)(5)-1 | Presidential Communications Privilege |
|---|---|
| **EXEMPTION (b)(6) and EXEMPTION (b)(7)(C)** | **UNWARRANTED INVASIONS OF PERSONAL PRIVACY** |
| (b)(6)-1 and (b)(7)(C)-1 | Names and Identifying Information of FBI Special Agents and Professional Staff |
| (b)(6)-2 and (b)(7)(C)-2 | Personal Information Related to Judge Kavanaugh |
| (b)(6)-3 and (b)(7)(C)-3 | Names and Identifying Information of a Third Parties who Provided Information |
| (b)(6)-4 and (b)(7)(C)-4 | Names and Identifying Information of a Third Parties Merely Mentioned |
| (b)(6) and (b)(7)(C)-5 | Names and Identifying Information of Non-FBI Government Personnel |
| **EXEMPTION (b)(7)(A)** | **PENDING ENFORCEMENT PROCEEDINGS** |
| **EXEMPTION (b)(7)(D)** | **CONFIDENTIAL SOURCE INFORMATION** |
| (b)(7)(D)-1 | Names, Identifying Information About, and/or Information Provided By Sources Under Express Assurances of Confidentiality |
| **EXEMPTION (b)(7)(E)** | **INVESTIGATIVE TECHNIQUES AND PROCEDURES** |
| (b)(7)(E)-1 | FBI Secure Fax Numbers, Internal E-mail Addresses, Non-Public Web Addresses, and Internal E-mail Tools |
| (b)(7)(E)-2 | Database Identifiers / Printouts |
| (b)(7)(E)-3 | Collection/Analysis of Information |
| (b)(7)(E)-4 | Sensitive FBI File Numbers |

## EXEMPTION (b)(3) – INFORMATION PROTECTED BY STATUTE

(42)   Exemption (b)(3) protects information that is specifically exempted from public disclosure by a statute that:

> (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and
>
> (B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

5 U.S.C. § 552(b)(3).

### (b)(3)-1:        National Security Act of 1947, 50 U.S.C. § 3024 (i)(1)

(43)     The FBI asserted Exemption (b)(3) to protect information regarding follow up research that the FBI conducted on a third party—not Judge Kavanaugh—who was identified in the tip records the FBI processed in response to Plaintiffs' FOIA requests, in order to protect intelligence sources and methods.

(44)     The National Security Act of 1947, as amended, requires that the Director of National Intelligence ("DNI") "shall protect intelligence sources and methods from unauthorized disclosure."[5]  50 U.S.C. § 3024(i)(1).  As relevant to the FBI's application of Exemption (b)(3) here, the National Security Act of 1947 was enacted before the date of enactment of the OPEN FOIA Act of 2009, and on its face, leaves no discretion to agencies about withholding from the public information about intelligence sources and methods.  Thus, the protection afforded to intelligence sources and methods by 50 U.S.C. § 3024(i)(1) is absolute.  *See CIA v. Sims*, 471 U.S. 159 (1985).

(45)     In order to fulfill its obligation of protecting intelligence sources and methods, the DNI is authorized to establish and implement guidelines for the Intelligence Community for the classification of information under applicable laws, Executive Orders, or other Presidential Directives, and for access to and dissemination of intelligence.  In implementing this authority, the DNI promulgated Intelligence Community Directive ("ICD") 700, which provides that IC elements shall protect "national intelligence and intelligence sources and methods and activities

---

[5] Section 102A(i)(1) of the National Security Act was previously codified at 50 U.S.C. § 403(i)(1). As a result of the reorganization of Title 50 of the U.S. Code, Section 102A(i)(1) is now codified at 50 U.S.C. § 3024(i)(1).

from unauthorized disclosure." ICD 700 (Jun. 7, 2012) at ¶ 2a.  The FBI is one of the member agencies comprising the IC, and as such must protect intelligence sources and methods.

(46)    Given the plain Congressional mandate to protect the IC's sources and methods of gathering intelligence, the FBI has determined that intelligence sources and methods would be revealed if any of the withheld information is disclosed to Plaintiffs.  Therefore, the FBI is prohibited from disclosing such information under § 3024(i)(1).

(47)    The FBI is asserting Exemption (b)(3) in this case, at times in conjunction with Exemption (b)(7)(E), to protect information the disclosure of which would reveal intelligence sources and methods in the tip records processed in this case.  Those records contain information regarding research the FBI conducted about a third party—not Judge Kavanaugh.  In conducting this research, the FBI located information, which it recorded within the tip records, related to FBI intelligence-gathering initiatives, including national security investigation file numbers. Revealing this information would reveal the existence of these national security investigations, which is key information about the FBI's intelligence gathering sources and methods.  Thus, in accordance with 50 U.S.C. § 3024(i)(1), the FBI asserted Exemption (b)(3) to withhold this information.

## EXEMPTION (b)(5) – PRIVILEGED INFORMATION

(48)    Exemption (b)(5) exempts "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).

(49)    Exemption (b)(5) incorporates the traditional privileges that the government may assert in civil litigation against a private litigant, including privileges that are constitutionally based, and exempts from FOIA's reach documents covered by such privileges.

(50)   DOJ and WHCO were consulted about the supplemental background investigation file because the FBI conducted the supplemental background investigation of Judge Kavanaugh at WHCO's direction, as explained further below.  In response to the FBI's consultation request, WHCO asserted Exemption (b)(5) over the supplemental background investigation file, concluding that it is protected by the presidential communications privilege.  Accordingly, the supplemental background investigation file has been withheld in full pursuant to Exemption (b)(5).

**(b)(5)-1:**      **Presidential Communications Privilege**

### Background on the Presidential Communications Privilege

(51)   The presidential communications privilege applies to documents and other materials that reflect presidential decision-making and deliberations that the President believes should remain confidential.  The privilege protects not only direct communications with the President, but also communications solicited and received by immediate presidential advisors and members of their staffs in the course of preparing advice for the President, even when those communications are not made directly to the President.  This privilege preserves the President's ability to obtain frank information from his advisors and to make decisions in confidence.  The scope of the privilege is defined in terms of communications that involve the Office of the President, the exercise of the President's responsibilities, and confidential presidential decision-making.  One such Presidential responsibility is the nomination of Supreme Court Justices.

### Background on FBI Background Investigations

(52)   Under Article II Section 2 of the United States Constitution, it is the President's responsibility to "nominate, and by and with the Advice and Consent of the Senate . . . appoint" Supreme Court Justices.  In order to assist the President with this constitutional decision-making role, the DOJ entered into a revised Memorandum of Understanding ("MOU") with the President

in 2010 regarding FBI background investigations of nominees, which is still in force today.  *See*

**Exhibit V**, *Memorandum of Understanding Between the Department of Justice and the President*

*of the United States Regarding Name Checks and Background Investigations Conducted by the*

*Federal Bureau of Investigation* ("2010 MOU").  Pursuant to that MOU, upon the request of the

President, or of an official designated by the President, the FBI conducts background checks of

nominees—including Supreme Court nominees—to ascertain relevant information to assist the

President in his determination of the nominee's suitability for the position.

(53)    The 2010 MOU sets forth the procedures involved when the President seeks to

initiate FBI background checks of nominees.  Specifically, the President, or an official who has

been designated by the President, makes a written request to the FBI for a background investigation

of the nominee, which is subject to various signature and certification requirements.

(54)    The 2010 MOU covers not only initial full-field background investigations of

nominees, but also limited updates and inquiries, such as follow-up inquiries solicited by the

President in order to resolve particular issues and questions regarding the nominee.  Such follow-

up inquiries requested by the President or his designee do not require an updated formal written

request so long as the nominee's confirmation is still pending.  Accordingly, they can be relayed

in less formal means.

### Background on the Kavanaugh Background Investigations

(55)    The President designated the White House Counsel to request the initial full-field

background investigation of then-Judge Kavanaugh, and on July 10, 2018, WHCO initiated a

Level I FBI background investigation.  That investigation is not the subject of this case.

(56)    After the emergence of allegations against Judge Kavanaugh on or around

September, 2018, an authorized official within the White House Counsel's Office sent a series of

emails to the FBI on behalf of the President soliciting the follow-up inquiry, also known as the supplemental background investigation, which is at issue in this litigation.

(57)     The information derived from and related to that follow-up inquiry—referred to herein as the "supplemental background investigation file"—is documented in a 527-page collection of a series of e-mail communications, e-mail attachments, FD-302s, exhibits, and related administrative documents.

(58)     Specifically, the supplemental background investigation file consists of: (1) e-mail communications between FBI agents and the White House official who was authorized to initiate the supplemental inquiry, in which the official requested that the FBI conduct the supplemental background investigation and identified individuals to interview and topics to discuss in the interviews; (2) attachments to the e-mail communications between FBI agents and the White House official, including a media story reporting allegations against Judge Kavanaugh, a copy of Dr. Christine Blasey Ford's written testimony submitted to the Senate Judiciary Committee on September 26, 2018, the transcript of the Senate Judiciary Committee's September 27, 2018, hearing on Judge Kavanaugh's Supreme Court nomination, and letters from third parties to members of the Senate Judiciary Committee; (3) e-mail communications between FBI agents and third parties (or the third parties' counsel), and internal FBI e-mails, regarding scheduling of interviews and other logistics; (4) FD-302s documenting the FBI's interviews, including a 302 attachment showing private social media messages and text messages that were the subject of interview discussions; (5) FBI agents' hand-written interview notes; (6) fax cover sheets and transaction receipts; and (7) FD-1036 import forms, which are similar to fax cover sheets and are used to import FBI-related documents for which there is no standard webform, such as a Word documents, Excel spreadsheet, or PDFs, into the FBI's database.

(59)    Over the course of its supplemental background investigation, the FBI incrementally faxed the entire supplemental background investigation file—including the e-mail communications that the White House Counsel official initially sent to FBI soliciting the supplemental background investigation—to the White House Counsel's Office, with the potential exception of the FBI agents' hand-written interview notes and a small number of administrative note pages.  The FBI and White House Counsel's Office have been unable to confirm that those pages were included in the fax transmissions.  In addition to the White House Counsel's Office confirming that it received the remaining pages in the supplemental background investigation file, many of those pages themselves show that they were transferred to the White House Counsel's Office.  For instance, the e-mails between FBI agents and the White House official, in which the official requested the supplemental background investigation and identified individuals to interview as well as interview topics, is plainly information authored and solicited by the White House.  Further, the fax cover sheets show that other documents in the supplemental background investigation file, such as the FD-302s and attached images of private social media messages and text messages, were transferred to the White House Counsel's Office.

***Background on Loaning the Kavanaugh Supplemental***
***Background Investigation File to Congress***

(60)    A separate Memorandum of Understanding, entered into in 2009, governs the loaning of judicial background investigations by the President and his advisors in the White House Counsel's Office to the Senate Judiciary Committee.  The 2009 MOU contains numerous strict confidentiality provisions governing the sharing, access, and return of FBI background investigation reports.

(61)    The FBI has been advised that the FD-302s, the referenced attachments of images of text messages and social media messages, and the tip-line materials, were loaned to the Senate

Judiciary Committee on October 4, 2018, by a White House Counsel's Office attorney acting at the direction of the White House Counsel. The FBI has further been advised that the documents were subsequently returned to the DOJ's Office of Legal Policy, and that, in loaning this information to the Committee, the White House did not intend to waive any privileges but instead loaned the materials in an effort to inform the President's decision to continue with his nominee, based on feedback he received from Senators. To the contrary, the documents were loaned pursuant to the mandate and strict confidentiality protections set forth in the 2009 MOU.

### Application of the Presidential Communications Privilege

(62)   WHCO reviewed the supplemental background investigation file and concluded that because that file was requested on behalf of, and provided to, the President to assist him in a fundamental constitutional matter of Presidential decision-making—whether to continue the nomination of Judge Kavanaugh to the Supreme Court—the materials are covered by the presidential communications privilege. Specifically, the supplemental background investigation file was solicited by a White House official on behalf of the President in order to aid in presidential decision-making, and, with the potential exceptions described in paragraph 59 of this declaration, the resulting supplemental background investigation file created by the FBI was transmitted to the White House Counsel for that purpose. Moreover, WHCO concluded that disclosure of this material would inhibit the President's ability to engage in effective communications and decision-making by interfering with the ability of the President to seek and obtain candid information. Accordingly, WHCO concluded that these materials fall squarely within the protections afforded by the presidential communications privilege and must be withheld in full. Because WHCO concluded that the privilege applies to the materials in their entirety, no segregation is possible.

Accordingly, the supplemental background investigation file was withheld in full pursuant to Exemption (b)(5) in conjunction with the presidential communications privilege.

## EXEMPTION (b)(7) – RECORDS COMPILED FOR LAW ENFORCEMENT PURPOSES

(63)   Exemption (b)(7) protects six categories of information or records compiled for law enforcement purposes. The FBI withheld information under four subparts of Exemption (b)(7) to protect various law enforcement interests, including protecting on-going enforcement proceedings, the privacy of individuals mentioned in law enforcement files, confidential sources, and law enforcement techniques and procedures.

### *EXEMPTION (b)(7) THRESHOLD*

(64)   Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it must first demonstrate the records or information at issue were compiled for law enforcement purposes. Pursuant to 28 U.S.C. §§ 553 and 534, Executive Order 12333, as implemented by the Attorney General's Guidelines for Domestic Operations, and 28 C.F.R. § 0.85, the FBI is the primary investigative agency of the federal government with authority and responsibility to investigate all violations of federal law not exclusively assigned to another agency, to conduct investigations and activities to protect the United States and its people from terrorism and threats to national security, and to further the foreign intelligence objectives of the United States.

(65)   The responsive records in this case were compiled pursuant to the FBI's investigative authority. An effective judicial nomination process relies on proper vetting of nominees to ensure that they are fit to serve. Background investigations are an integral part of such vetting of judicial and other nominees, as well as federal employees and contractors. Accordingly, background investigations conducted to assess a nominee's or applicant's qualifications inherently relate to law enforcement, and as such, records compiled during

background investigations are compiled for law enforcement purposes. Here, the FBI is authorized to conduct such investigations pursuant to the 2010 MOU between the White House and the DOJ discussed previously. *See also* **Exhibit V**. Accordingly, the FBI concluded that the supplemental background investigation file was compiled for law enforcement purposes, as required by Exemption (b)(7).

(66)     Additionally, the responsive records consist of tips received from the public by the FBI alleging possible criminal conduct. The core purpose of tips is to allow the public to report possible criminal conduct, with the end purpose being enforcement of laws by the FBI should the FBI find evidence of criminal behavior. Tips are an important law enforcement tool the FBI uses to leverage the assistance of the public in discovering and investigating criminal behavior. Thus, the tips also satisfy Exemption (b)(7)'s threshold requirement.

### EXEMPTION (b)(7)(A) – PENDING ENFORCEMENT PROCEEDINGS

(67)     FOIA Exemption (b)(7)(A) protects "records or information compiled for law enforcement purposes [when disclosure] could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).

(68)     In addition to satisfying Exemption (b)(7)'s threshold, an agency must establish that (a) there is a pending or prospective law enforcement proceeding and (b) disclosure of responsive records could reasonably be expected to adversely affect it.

(69)     While the FBI often asserts Exemption (b)(7)(A) categorically to protect the entire contents of an investigative file, here the FBI asserted Exemption (b)(7)(A) in a limited fashion to protect discrete information contained within tips that was evaluated by the FBI, determined to be a credible threat, and resulted in the initiation of current, ongoing investigative efforts. The FBI tip line is a way to collect information of criminal activity and complaints of the public. This

- 28 -

information collected is analyzed, and in specific instances, used to open investigations.   The release of this information concerning pending investigations would reveal unknown information concerning pending enforcement procedures, to include the existence of unknown investigations/and proceedings. The FBI determined that release of any of this information would reveal the government's investigation to the targets, which could permit them to take steps to thwart the investigation, identify and tamper (or attempt to tamper) with witnesses, and/or destroy, conceal, or fabricate evidence. As such, revealing this information could reasonably be expected to interfere with pending enforcement proceedings.   Thus, the FBI has applied Exemption (b)(7)(A) to protect this information.

### EXEMPTIONS (b)(6) AND (b)(7)(C) – INVASIONS OF PERSONAL PRIVACY

(70)   Exemption (b)(6) exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). All information that applies to a particular person falls within the scope of Exemption (b)(6).

(71)   Exemption (b)(7)(C) similarly exempts from disclosure "records or information compiled for law enforcement purposes [when disclosure] could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).[6]

(72)   When withholding information pursuant to these two exemptions, the FBI is required to balance the privacy interests of the individuals mentioned in these records against any

---

[6] The practice of the FBI is to assert Exemption (b)(6) in conjunction with Exemption (b)(7)(C). Although the balancing test for Exemption (b)(6) uses a "would constitute a clearly unwarranted invasion of personal privacy" standard and the test for Exemption (b)(7)(C) uses the lower standard of "could reasonably be expected to constitute an unwarranted invasion of personal privacy," the analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion.   The privacy interests are balanced against the public's interest in disclosure under both exemptions.

public interest in disclosure.   In asserting these exemptions, each piece of information was scrutinized to determine the nature and strength of the privacy interest of every individual whose name and/or identifying information appears in the documents at issue.   When withholding the information, the individual's privacy interest was balanced against the public's interest in disclosure.   For purposes of these exemptions, a public interest exists only when information about an individual would shed light on the FBI's performance of its mission to protect and defend the United States against terrorist and foreign intelligence threats, to uphold and enforce the criminal laws of the United States, and to provide leadership and criminal justice services to federal, state, municipal, and international agencies and partners.   In each instance wherein information was withheld pursuant to Exemptions 6 and 7(C), the FBI determined that the individuals' privacy interests outweighed any public interest in disclosure.

**(b)(6)-1       Names and Identifying Information of FBI Special Agents and**
**(b)(7)(C)-1:   Professional Staff**

(73)     Within coded category (b)(6)/(b)(7)(C)-1, the FBI protected the names and identifying information of FBI Special Agents ("SAs") and professional staff.   These FBI SAs and professional staff were responsible for conducting, supervising, and/or maintaining the supplemental background investigation of Judge Kavanaugh; maintaining records related to this investigation; and managing and/or responding to tips received by the FBI.   These responsibilities included, but were not limited to coordinating/completing tasks in support of the FBI's investigative and administrative functions, compiling information, conducting interviews, and/or reporting on the status of the investigation.

(74)     Special Agents.   Assignments of SAs to any particular investigation are not by choice.   Publicity, adverse or otherwise, arising from association with a particular investigation, may seriously prejudice their effectiveness in conducting other investigations or performing their

day-to-day work. Moreover, FBI SAs, as individuals, have privacy interests in being free from unnecessary, unofficial questioning as to the conduct of this investigation, as well as other investigations on which they have worked. FBI SAs were and may still be in positions of access to information regarding official law enforcement investigations, and therefore could become targets of attempts to gain unauthorized access to investigations, or information about such investigations, if their identities were released. Moreover, publicity associated with the release of an SA's identity in connection with a particular investigation could trigger hostility toward a particular SA. Persons targeted by such investigations, those sympathetic to targeted individuals, and those unhappy with the outcome of an investigation may harass, or do worse to, an SA based on their participation in an investigation. Accordingly, the FBI has concluded that SAs mentioned in the responsive records have substantial privacy interests.

(75)    In contrast, there is no public interest served by disclosing the SAs' identities because their identities would not, themselves, significantly increase the public's understanding of the FBI's operations and activities.

(76)    Thus, on balance, disclosure of this information would constitute a clearly unwarranted invasion of their personal privacy, and the FBI properly protected its SAs' privacy pursuant to Exemptions (b)(6) and (b)(7)(C).

(77)    Professional Staff. The FBI also withheld the names and identifying information of FBI professional staff pursuant to Exemptions (b)(6) and (b)(7)(C). These FBI professional staff were assigned to handle tasks related to supplemental background investigation of Judge Kavanaugh; maintain records related to this investigation; and manage and/or respond to tips received by the FBI. These FBI employees have substantial privacy interests for the same reasons described above for FBI SAs. These FBI professional staff were and could still be in positions of

access to information regarding official law enforcement investigations, and therefore could become targets of harassing inquiries for unauthorized access to investigations if their identities were released.

(78)     In contrast, the FBI concluded that no public interest would be served by disclosing the identities of these FBI professional staff to the public because their identities would not, themselves, significantly increase the public's understanding of the FBI's operations and activities.

(79)     Accordingly, after balancing these employees' substantial privacy interests against the non-existent public interest, the FBI determined disclosure of their identities would constitute a clearly unwarranted invasion of their personal privacy, and therefore, properly protected their privacy interests pursuant to Exemptions (b)(6) and (b)(7)(C).

**(b)(6)-2**
**(b)(7)(C)-2:     Personal Information Related to Judge Kavanaugh**

(80)     In coded category (b)(6)/(b)(7)(C)-2, the FBI protected the file number for Judge Kavanaugh's supplemental background investigation file.  Since this file number is singular and pertains specifically to Judge Kavanaugh, it is a personal identifier for him in FBI's records system. Any reference to it would therefore be the same as a reference to his name.  The file number can be used to track where any information related to the supplemental background investigation file of Judge Kavanaugh—and thus to Judge Kavanaugh himself—is referenced within FBI records and systems.  Conversely, disclosing this file number would not significantly increase the public's understanding of the FBI's performance of its mission.  Thus, the FBI concluded that there was no public interest here sufficient to override Judge Kavanaugh's privacy interests in this information and protected the file number pursuant to FOIA Exemptions (b)(6) and (b)(7)(C).

(81)     Additionally, within this coded category, the FBI protected Judge Kavanaugh's home address.  Release of this information would clearly invade Judge Kavanaugh and his family's

privacy interests. Against this clear privacy interest, the FBI found no public interest in disclosure of this information as disclosure would not increase significantly increase public understanding of FBI activities and operations.

(82)     Finally, in both the tip records and supplemental background investigation file, the FBI protected information related to certain unsubstantiated allegations made about Judge Kavanaugh by third parties, other than information related to the allegations leading to the supplemental background investigation. The FBI concluded that disclosure of these allegations could reasonably be expected to subject Judge Kavanaugh to further derogatory inferences and criticism.   Furthermore, they could reasonably be expected to cause undue attention and embarrassment to his family. These allegations were not substantiated and were not previously officially, publicly disclosed. Accordingly, the FBI concluded that Judge Kavanaugh and his family maintain privacy interests in relation to this information. And while disclosure of this information might shed some miniscule light on the operations and activities of the FBI in relation to this matter, the FBI concluded that the Kavanaughs' substantial privacy interests outweigh any potential public interest that may exist. Accordingly, the FBI properly protected this information pursuant to FOIA Exemptions (b)(6) and (b)(7)(C).[7]

**(b)(6)-3     Names and Identifying Information of**
**(b)(7)(C)-3:   Third Parties who Provided Information to the FBI**

(83)     In coded category (b)(6)/(b)(7)(C)-3, the FBI protected the names and identifying information of individuals who were interviewed and/or provided information by other means to

---

[7] On further review of the records at issue, the FBI determined portions of the information protected by (b)(6) and (b)(7)(C) within the tips also qualifies for protection pursuant to the justification described in this category. The same is true for the SBI file. This was not indicated in the FBI's original processing of these records. However, the FBI has fully indicated where this category is applicable within its attached *Vaughn* index. *See* Exhibit U.

the FBI during the course of its supplemental background investigation of Judge Kavanaugh or through tips.

(84)   The FBI has found information provided by individuals based on their personal knowledge is one of the most productive investigative tools for law enforcement agencies. The largest obstacle to successfully obtaining such information critical to FBI investigations, through an interview or otherwise, is fear by the individuals providing the information that their identities will be exposed publicly. Such exposure, in conjunction with their cooperation with law enforcement, could lead to harassment, intimidation by investigative subjects or their allies, legal or economic detriment, possible physical harm, or even death. In order to surmount their fear of reprisal, and the resulting tendency to withhold information, persons who provide such information to the FBI must be confident their names and personally-identifying information will be protected. The FBI has determined these individuals maintain substantial privacy interests in not having their identities disclosed in relation to assisting the FBI. In contrast, the FBI could identify no public interest in the disclosure of this information because disclosure of these third parties' names and identifying information would not by itself significantly increase the public's understanding of the operations and activities of the FBI. Accordingly, the FBI properly protected these individuals' privacy interests pursuant to Exemptions (b)(6) and (b)(7)(C). The FBI is also relying on Exemption (b)(7)(D) to protect individuals' identities in instances where they were provided express assurances of confidentiality.

**(b)(6)-4       Names and Identifying Information of**
**(b)(7)(C)-4:   Third Parties Merely Mentioned in the Responsive Records**

(85)   In coded category (b)(6)/(b)(7)(C)-4, the FBI protected the names and identifying information of third parties merely mentioned in the records responsive to Plaintiffs' requests. These individuals were not of investigative interest to the FBI and maintain substantial and

legitimate privacy interests in not having their personal information disclosed. Disclosure of the third parties' names and identifying information in connection with an FBI investigative matter can carry negative connotations. Disclosure of their identities may subject these individuals to possible harassment or criticism and focus derogatory inferences and suspicion on them. In contrast, the FBI could discern no public interest in disclosure because these individuals' identities would not, by themselves, significantly increase the public's understanding of FBI operations and activities. Thus, the FBI properly withheld these individuals' names and identifying information pursuant to FOIA Exemptions (b)(6) and (b)(7)(C).

**(b)(6)-5**
**(b)(7)(C)-5:    Names and Identifying Information of Non-FBI Government Personnel**

(86)    In coded category (b)(6)/(b)(7)(C)-5, the FBI protected the names and identifying information of non-FBI federal government personnel identified in the records responsive to Plaintiffs' requests. These employees are not high-ranking officials, such as Senior Executive Service or the equivalent. Disclosure of the identities of these non-FBI federal government personnel could subject these individuals to unauthorized inquiries about the supplemental background investigation, or even harassment because of their relationship to it, and would constitute a clearly unwarranted invasion of their personal privacy. As with the FBI employees discussed above, these employees have substantial privacy interests here. In contrast, these employees' identities would not, by themselves, significantly increase the public's understanding of FBI or Executive Branch operations and activities. Accordingly, the FBI properly protected the names and identifying information of these government employees pursuant to FOIA Exemptions (b)(6) and (b)(7)(C).

### EXEMPTION (b)(7)(D) – CONFIDENTIAL SOURCE INFORMATION

(87)     Exemption (b)(7)(D) protects records or information compiled for law enforcement

purposes when disclosure:

> could reasonably be expected to disclose the identity of a
> confidential source, including a state, local or foreign agency or
> authority or any private institution which furnished information on
> a confidential basis, and, in the case of a record or information
> compiled by a criminal law enforcement authority in the course of a
> criminal investigation or by an agency conducting a lawful national
> security intelligence investigation, information furnished by a
> confidential source.

5 U.S.C. § 552(b)(7)(D). Exemption (b)(7)(D) provides categorical protection for the identities of

confidential sources, as well as information provided by such sources in criminal or national

security investigations. No balancing of interests is required under this exemption and the public's

interest in the information is not a factor. Rather, once the FBI establishes that the source provided

information under express or implied assurances of confidentiality, the identity of the source and

all information the source provided in a criminal or national security investigation are exempt

under Exemption (b)(7)(D).

(88)     Numerous confidential sources report to the FBI on a regular basis, whether under

express or implied assurances of confidentiality. Information provided by these individuals is

singular in nature, and if released, could reveal their identities, and third parties of investigative

interest the sources were reporting on. The FBI has learned through experience sources assisting,

cooperating with, and providing information to the FBI must be free to do so without fear of

reprisal. The FBI has also learned sources must be free to furnish information to the FBI with

complete candor and without the understandable tendency to hedge or withhold information

because of fear their cooperation with the FBI will later be made public. Sources providing

information to the FBI should be secure in the knowledge that their assistance and their identities
will be held in confidence.

(89)    The release of a confidential source's identity would forever eliminate that source
as a means of obtaining information.  In addition, when the identity of one source is revealed, that
revelation has a chilling effect on the activities and cooperation of other sources.  Such a result
would eliminate one of the FBI's most important means of collecting information and thereby
severely hamper law enforcement efforts to detect and apprehend individuals engaged in the
violation of federal criminal laws.

**(b)(7)(D)-1:**     **Names, Identifying Information About, and/or Information Provided By**
                 **Sources Under Express Assurances of Confidentiality**

(90)    In coded category (b)(7)(D)-1, the FBI protected from disclosure the names,
identifying information about, and information provided by third parties to the FBI during the
course of the supplemental background investigation of Judge Kavanaugh under express
assurances of confidentiality.  In this case, these individuals, who provided specific and detailed
information that is singular in nature, specifically requested that their identities not be revealed.
Providing express assurances of confidentiality is essential to the FBI's ability to obtain relevant
and accurate information from confidential sources.  Without these assurances by the FBI, those
with access to information critical to FBI investigations may be reluctant to provide information
or may modify their statements in order to lessen the severity of any backlashes; therefore, the FBI
must provide credible assurances of confidentiality to these individuals in order to obtain factual,
relevant, and timely information.  Release of these individuals' identities and/or any singular
information they provided may lead to the revelation of their identities and would also display
unwillingness by the FBI to honor its assurances of confidentiality to current and future
confidential sources.  Therefore, releasing this information would have a lasting negative impact

on the FBI's about to obtain information from confidential sources in the future, who would understandably fear that their identities and assistance would not remain confidential. Furthermore, if the FBI disclosed these individuals' identities, they and their families could be subjected to embarrassment, humiliation, and physical or mental harm.  As such, releasing the identities of or the information provided by these individuals would adversely affect them and harm the FBI's ability to recruit and maintain reliable sources in the future.  Thus, the FBI properly protected this information pursuant to Exemption (b)(7)(D).

### EXEMPTION (b)(7)(E) – INVESTIGATIVE TECHNIQUES AND PROCEDURES

(91)     Exemption (b)(7)(E) protects records or information compiled for law enforcement purposes when release "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552 (b)(7)(E).

(92)     This exemption affords categorical protection to techniques and procedures used in law enforcement investigations; it protects techniques and procedures that are not well-known to the public as well as non-public details about the use of well-known techniques and procedures.

(93)     Within the responsive documents, Exemption (b)(7)(E) has been applied to non-public investigative techniques and procedures utilized by the FBI to pursue its law enforcement mission, and also to non-public details about techniques and procedures that are otherwise known to the public.

**(b)(7)(E)-1:**     **FBI Secure Fax Numbers, Internal E-mail Addresses, Non-Public Web Addresses, and/or Internal E-mail Tools**

(94)     In coded category (b)(7)(E)-1, the FBI protected secure fax numbers, internal e-mail addresses, non-public intranet web addresses, and secure internal e-mail tools.  Releasing this

information would provide criminals with specific targets for possible cyber-attacks and attacks on FBI secure communications. Considering the current cyber-security environment where government data breaches and other hacking attempts on government systems are prevalent, it is likely that the release of this type of information could provide hackers with avenues to exploit the FBI's Information Technology system. It is possible they could use this information to gain unauthorized access to FBI systems, view and/or manipulate sensitive investigative data, interfere with the FBI's non-public intranet protocol, and/or hinder the FBI's ability to enforce the law by disrupting the FBI's internal communications. Releasing this information poses substantial risks to FBI information systems, could potentially decrease the FBI's effectiveness, and could enable criminals to circumvent the law. Accordingly, the FBI asserted Exemption (b)(7)(E) to withhold this information.

**(b)(7)(E)-2:**   **Database Identifiers/Printouts**

(95)   In coded category (b)(7)(E)-2, the FBI protected the identities of sensitive investigative databases and database search results located through queries of these non-public databases used for official law enforcement purposes by the FBI. The FBI also protected non-public details about information located within the FBI's PALM database, to include transaction (tip) numbers, links between different tips, and how the FBI evaluated the investigative relevance of certain tips. Releasing the identities of these databases and any information located through queries of these databases would give criminals insight into the available tools and resources the FBI uses to conduct criminal and national security investigations (*i.e.*, the scope of information stored within the databases, how the FBI uses the databases to support its investigations, the types of information most valued by the FBI for particular investigations, and vulnerabilities of the databases). As such, revealing this information would provide criminals with the avenue to

discover how they might avoid providing the FBI with key information it could leverage to pursue investigations of their criminal conduct; how they should structure their behavior to avoid triggering investigative scrutiny by the FBI; and how they might gain access to these investigative databases to exploit, destroy, and corrupt the information within these databases. Therefore release of any of this information could enable criminals to deprive the FBI the utility of these key investigative databases, and enable them to more effectively circumvent the law. Thus, the FBI asserted Exemption (b)(7)(E) to withhold this information.

**(b)(7)(E)-3:   Collection/Analysis of Information**

(96)    In coded category (b)(7)(E)-3, the FBI protected the methods the FBI uses to collect and analyze information it obtains for investigative purposes. The release of this information would disclose the identity of methods used in the collection and analysis of information, including how and from where the FBI collects information and the methodologies employed to analyze it once collected. Such disclosures would enable subjects of FBI investigations to circumvent similar currently used techniques. The relative utility of these techniques could be diminished if the actual techniques were released in this matter. This in turn would facilitate the accumulation of information by investigative subjects regarding the circumstances under which the specific techniques were used or requested and the usefulness of the information obtained. Release of this type of information would enable criminals to educate themselves about the techniques employed for the collection and analysis of information and therefore allow these individuals to take countermeasures to circumvent the effectiveness of these techniques and to continue to violate the law and engage in intelligence, terrorist, and criminal activities. Accordingly, the FBI has properly withheld this information pursuant to FOIA Exemption 7(E).

**(b)(7)(E)-4:**   **Sensitive FBI File Numbers**

(97)     In coded category (b)(7)(E)-4, the FBI protected sensitive investigative file numbers.   The FBI determined Exemption (b)(7)(E) is appropriate for protecting these file numbers as the release of file numbering conventions identifies the investigative interest or priority given to such matters.   The file numbers the FBI protected are not known to the general public. These file numbers contain three separate portions.   The first portions of these file numbers consists of FBI file classification numbers which indicate the types of investigative/intelligence gathering programs to which these files pertain.   Many of the FBI's classification numbers are public, which makes disclosure of this information even more telling.   Release of known file classification numbers in the context of investigative records would immediately reveal the types of investigations being pursued, and thus the types of investigative techniques and procedures available to FBI investigators, and/or non-public facets of the FBI's investigative strategies.   For example, revealing the FBI has a money laundering investigative file on a subject who was only known to be investigated for crimes related to public corruption, would reveal key non-public information about the FBI's investigative strategies and gathered evidence.   Additionally, releasing non-public FBI file classification numbers would reveal critical information about non-public investigative techniques and procedures, and provide criminals and foreign adversaries the ability to discern the types of highly sensitive investigative strategies the FBI is pursuing whenever such file classification numbers are present within these and other sensitive FBI investigative records.

(98)     The protected investigative file numbers also contain two-letter office of original codes, indicating which FBI field office or overseas FBI legal attaché originated the investigations at issue.   Providing this information, in many instances, would provide critical information about where and how the FBI detected particular criminal behaviors or national security threats, and

- 41 -

reveal key pieces about the FBI's non-public investigations or intelligence/evidence gathering sources and methods. Revealing this information could also risk disclosing unknown FBI investigations or intelligence gathering initiatives, by revealing interests in varying areas of FBI investigative responsibility. Releasing this information could also possibly provide significant information about the FBI's failure to detect certain types of criminal behavior. For example, a criminal operating out of San Francisco, California with ties to a criminal organization under investigation in the FBI's Seattle Field Office, could request the FBI's Seattle Field Office's investigative file. If the FBI were to reveal all of the originating office codes in the investigative files present in Seattle's file, and there was no indication the FBI ever pursued an investigation in San Francisco, the criminal could reasonably assume the FBI failed to locate any evidence of their wrongdoing, emboldening them to continue their activities, undeterred.

(99)   The third portion of these investigative files consists of the numbers given to the unique investigative initiatives these files were created to memorialize. Releasing these singular file numbers would provide criminals and foreign adversaries with a tracking mechanism by which they can place particular files/investigations within the context of larger FBI investigative efforts. Continued release of sensitive investigative file numbers would provide criminals with an idea of how FBI investigations may be interrelated and when, why, and how the FBI pursued different investigative strategies. This would provide criminals with a means of judging where the FBI allocates its limited investigative resources, how the FBI responds to different investigative circumstances, what the FBI knows and when/how they obtained the knowledge, and if there are knowledge-gaps in the FBI's gathered intelligence.

(100)   In summary, repeatedly releasing sensitive FBI investigative file numbers would allow determined criminals and foreign adversaries to obtain an exceptional understanding of the

body of investigative intelligence available to the FBI; and where, who, what and how it is investigating certain detected activities. Release of this information would enable these criminals and foreign adversaries to predict FBI investigations and structure their behavior to avoid detection and disruption by FBI investigators, enabling them to circumvent the law. Accordingly, the FBI properly asserted FOIA Exemption (b)(7)(E) to protect this type of information.

## SEGREGABILITY

(101) As discussed previously, the FBI reviewed a total of 2,579 responsive pages and released 23 pages in full and 2,029 pages in part. The FBI also withheld 527 pages in full, pursuant to FOIA exemptions or because they were duplicates of other records processed in this case. The FBI reviewed each page, line-by-line, to identify exempt information and where reasonably possible, to segregate and release non-exempt information to Plaintiffs.

(a)    **Pages Released In Part**.    Following the segregability review, RIDS determined 2,029 pages could be released in part with redactions based on the FOIA exemptions identified on the pages released to Plaintiffs. These pages comprise a mixture of material that could be, and was, segregated for release and material that was withheld as release would trigger foreseeable harm to one or more interest protected by the FOIA exemptions cited on these pages. Once all exemptions were applied, the FBI concluded that there was not further information that could be segregated and released to Plaintiffs, beyond what they were provided, because further segregation risked revealing exempt information or because further segregation would result in the release of nothing more than random words or sentence fragments without meaningful informational content.

(b)    **Pages Withheld in Full Pursuant to FOIA Exemptions**. DOJ and WHCO were consulted about the supplemental background investigation file. Following their review, they

advised the FBI to withhold the supplemental background investigation file, consisting of 527 pages, in full. No information was identified as being available to segregate and release, due to the risk of revealing privileged information.

(c)   **Pages Withheld in Full As Duplicates**. The FBI identified 65 pages of duplicates within the responsive records. It is the FBI's standard practice not to process duplicate pages, as doing so expends finite processing resources with a net result of no additional information being released to requesters.

## CONCLUSION

(102)   The FBI performed adequate and reasonable searches for records subject to the FOIA and responsive to Plaintiffs' requests, and located the specific documents requested by Plaintiffs. The FBI processed the responsive records under the access provisions of the FOIA to provide maximum disclosure. The FBI released all reasonably segregable non-exempt information to Plaintiffs, and properly withheld exempt information pursuant to FOIA Exemptions (b)(3), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E). Further, the FBI carefully examined the responsive documents and determined the information withheld from Plaintiffs, if disclosed, would reveal information protected from disclosure by statute; would cause a clearly unwarranted invasion of personal privacy, or could reasonably be expected to constitute an unwarranted invasion of personal privacy; could reasonably be expected to disclose the identity of and information provided by confidential sources; and/or would disclose techniques and procedures for law enforcement investigations. After extensive review of the documents at issue, the FBI determined that there is no further non-exempt information that can be released to Plaintiffs. Finally, following consultation with DOJ and WHCO, the FBI withheld the supplemental background investigation file in full pursuant to Exemption (b)(5) based on the determination that

it is subject to the presidential communications privilege and that no information within the file could be disclosed without revealing privileged information.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and Exhibits A through V are true and correct copies.

Executed this 25th day of October, 2019.

David M. Hardy
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia