## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| BUZZFEED, INC., *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 18-cv-2567 (BAH) |
| | Chief Judge Beryl A. Howell |
| FEDERAL BUREAU OF INVESTIGATION, | |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs, Buzzfeed, Inc. and Jason Leopold, an investigative reporter for Buzzfeed, challenge the response of the defendant, the Federal Bureau of Investigation ("FBI"), to four requests submitted between October 4 and 6, 2018, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for materials collected as part of the FBI's supplementary background investigation ("SBI") into then-Judge Brett Kavanaugh in the fall of 2018. *See generally* Am. Compl., ECF No. 6. The SBI was requested by the President, pursuant to a decade-old Memorandum of Understanding ("MOU") between the President and the Department of Justice governing procedures for the President to task the FBI to perform background investigations "to ascertain facts and information relevant to [an] Appointee's … suitability for Federal government employment or retention in such employment." Gov't Mot. Summ. J. ("Gov't Mot."), Ex. V, Memorandum of Understanding Between the Department of Justice and the President of the United States Regarding Name Checks and Background Investigations Conducted by the Federal Bureau of Investigation ("2010 MOU") ¶ 2.b, ECF No. 23-4; *see also* Gov't Mot., Ex. 3, Declaration of David M. Hardy (Oct. 25, 2019) ("Hardy Decl."), ¶¶ 52–54, ECF No. 23-3.

The FOIA requests at issue sought "a copy of the final report sent to the White House and the Senate Judiciary Committee on either October 3 or October 4, 2018," and "[a]ll interview notes; investigative notes; FD-302s relating or referring to the FBI investigation into allegations leveled against Mr. Kavanaugh."  Am. Compl., Ex. A, Pls. FOIA Request, ECF No. 6-1.  The parties have now cross-moved for summary judgment.  Gov't Mot. Summ. J. ("Gov't Mot."), ECF No. 23; Pls.' Opp'n Gov't Mot. & Cross-Mot. Summ. J. ("Pls.' Cross-Mot."), ECF No. 25.  For the reasons set forth below, the FBI's motion for summary judgment is granted.

## I.      BACKGROUND

In September 2018, after allegations of sexual misconduct against then-Supreme Court nominee Brett Kavanaugh became public, "an authorized official within the White House Counsel's Office" directed the FBI to undertake an SBI into these allegations.  Hardy Decl. ¶ 56. That investigation ultimately produced a "supplemental background investigation file" ("SBI File"), consisting of a 527-page collection of various "e-mail communications, e-mail attachments, FD-302s, exhibits, and related administrative documents."  *Id*. ¶ 57.  More specifically, these collected documents include: (1) "e-mail communications between FBI agents and the White House official who was authorized to initiate the supplemental inquiry," plus e-mail attachments; (2) "e-mail communications between FBI agents and third parties (or the third parties' counsel), and internal FBI e-mails, regarding scheduling of interviews and other logistics"; (3) "FD-302s documenting the FBI's interviews, including a 302 attachment showing private social media messages and text messages that were the subject of interview discussions"; (4) "FBI agents' hand-written interview notes"; (5) "fax cover sheets and transaction receipts"; and (6) "FD-1036 import forms, which are similar to fax cover sheets and are used to import FBI-related documents for which there is no standard webform."  *Id*. ¶ 58.  The contents of the

SBI File were "incrementally faxed" by the FBI to the White House Counsel's Office, Hardy Decl. ¶ 59, and portions of this file were subsequently loaned to the Senate Judiciary Committee on October 4, 2018, *id.* ¶ 61.

The four FOIA requests at issue pertain to the FBI's SBI for now-Justice Kavanaugh that concluded with production to the White House Counsel's Office of the SBI File.  On October 4, 2018, plaintiffs submitted the first of the four requests, seeking "[a] copy of the final report sent to the White House and the Senate Judiciary Committee on either October 3 or October 4, 2018 on Supreme Court nominee Brett Kavanaugh" and "[a]ll interview notes; investigative notes; FD-302s relating or referring to the FBI investigation into allegations leveled against Mr. Kavanaugh."  Am. Compl., Ex. A, ECF No. 6-1.  Plaintiffs submitted a second request the next day, this time seeking "[a]ll submissions to the FBI tip line, FBI web portal and emails to FBI Headquarters relating or referring to Supreme Court nominee Brett Kavanaugh, allegations leveled against him referring to sexual assault, his character, his drinking, Georgetown Prep, his years as a high school student and college student, requests by individuals to be interviewed by the FBI," as well as well as any correspondence between the FBI and individuals who submitted such tips and internal correspondence regarding the supplementary investigation.  Am. Compl., Ex. E, ECF No. 6-5.  Plaintiffs third request, submitted on October 6, 2018, again sought the FBI's final report as well as "interview notes; investigative notes; FD-302s relating or referring to the FBI investigation…"  Am. Compl., Ex. I, ECF No. 6-9.  Their last request, also submitted on October 6, 2018, sought all letters sent "to the FBI by [sic] relating or referring to Supreme Court nominee Brett Kavanaugh and any accusations leveled against him about his conduct, his character, his behavior and/any records attesting to his character."  Am. Compl., Ex. M, ECF No. 6-13.  Less than a week later, on October 11, 2018, the FBI acknowledged receipt of and

3

approved expedited processing for all four of plaintiffs' requests.  Am. Compl. ¶¶ 7–8, 14–15,

20–21, 26–27; Gov't's Statement of Material Facts as to Which There is No Genuine Issue

("Gov't's SOF"), ¶ 3, 6, 9, 11, ECF No. 23-2.

The FBI searched for records responsive to the four requests in six locations—the

agency's Central Records System, Criminal Justice Information Services Division, Office of

Public Affairs, Office of Congressional Affairs, Office of the Executive Secretariat, and Security

Division—after "conclud[ing] that these were the locations/offices within the FBI likely to

maintain responsive records, and that no other locations or offices were likely to maintain

responsive records."  Hardy Decl. ¶ 19.  Between May 3 and August 7, 2019, the FBI produced

four sets of responsive "tip records" to plaintiffs, "with certain information withheld pursuant to

FOIA Exemptions (b)(6), (b)(7)(A), (b)(7)(C), and (b)(7)(E)."  Gov't's SOF ¶¶ 14–17.  These

records were also published online in "The Vault," the FBI's online FOIA Library, in accordance

with 5 U.S.C. § 522(a)(2)(D)(ii)(II), which requires agencies to "make available for public

inspection in an electronic format" records that "have been requested 3 or more times."  *Id.* ¶ 18.

Overall, the FBI "processed a total of 2,579 pages of responsive records," of which it released

"23 pages in full" and "2,029 pages in part," Hardy Decl. ¶ 4, leaving 527 pages withheld in full.

The 527-pages withheld in full comprised the SBI File, which the FBI determined was

exempt from disclosure "pursuant to [FOIA] Exemption (b)(5), in conjunction with the

presidential communications privilege."  Gov't's SOF ¶ 19.  The agency further informed

plaintiffs that portions of the SBI File were also withheld "pursuant to FOIA Exemptions (b)(6),

(b)(7)(C), (b)(7)(D), and (b)(7)(E)."  *Id.*  The bases for these withholdings are set out in the

FBI's *Vaughn* Index, *see* Gov't's Mot., Ex. U, *Vaughn* Index, ECF No. 23-4,[1] and further

---

[1]    "A *Vaughn* index describes the documents withheld or redacted and the FOIA exemptions invoked, and explains why each exemption applies."  *Prison Legal News v. Samuels*, 787 F.3d 1142, 1145 n.1 (D.C. Cir. 2015).

explained in a declaration from David M. Hardy, the Section Chief of the Record/Information Dissemination Section within the FBI's Information Management Division, *see* Hardy Decl.

Plaintiffs "do not object to FBI's limited redactions under Exemptions 6 and 7[.]"  Pls.' Reply Supp. Pls.' Cross-Mot. (Pls.' Reply") at 1, n.1, ECF No. 30; *see also* Pls.' Mem. Opp'n Gov't's Mot. & Supp. Pls.' Cross-Mot. ("Pls.' Opp'n") at 13, ECF No. 25-1 (stating that plaintiffs do not contest "the withholding pursuant to Exemption 6 of the names and identifying information of any third-parties who provided information to the FBI to the extent those names (if any) were not already released by the Judiciary Committee or are otherwise public, the names of FBI agents and staff, the names and identifying information of third-parties merely mentioned, Judge Kavanaugh's home address, or the names and identifying information of non-FBI government personnel."); Gov't's Mem. Pts & Auth. In Opp'n To Pls.' Cross-Motion For Summ. J. & Reply Supp. Gov't's Mot. For Summ. J. ("Gov't's Opp'n"), at 1, ECF No. 28 ("Plaintiffs do not challenge the FBI's searches or withholdings pursuant to Exemptions (b)(3), (b)(7)(A), (b)(7)(D), and (b)(7)(E); or its (b)(6) and (b)(7)(C) withholdings of the names and identifying information of FBI special agents, FBI professional staff, third parties who provided information to the FBI or were merely mentioned, non-FBI government personnel, and Judge Kavanaugh's home address.").  Thus, plaintiffs' sole challenge is to the FBI's withholding in full, under Exemption 5, of the 527-page SBI File.  *See generally*, Pls.' Reply.

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "In FOIA cases, summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather

than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Aguiar v. DEA*, 865 F.3d 730, 734–35 (D.C. Cir. 2017) (internal quotation marks omitted) (quoting *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013)); *see also Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001) ("[A]n agency is entitled to summary judgment if no material facts are in dispute and if it demonstrates 'that each document that falls within the class requested either has been produced or is wholly exempt from the Act's inspection requirements.'" (quoting *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978))).  Most FOIA cases will be resolved on summary judgment. *Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).

To balance the public's interest in governmental transparency and "legitimate governmental and private interests [that] could be harmed by release of certain types of information," *Judicial Watch, Inc. v. U.S. Dep't of Defense*, 913 F.3d 1106, 1108 (D.C. Cir. 2019) (internal quotation mark omitted) (quoting *FBI v. Abramson*, 456 U.S. 615, 621 (1982)), FOIA has nine exemptions, set forth in 5 U.S.C. § 552(b), which "are 'explicitly made exclusive' and must be 'narrowly construed,'" *Milner v. Dep't of the Navy*, 562 U.S. 562, 565 (2011) (citations omitted) (first quoting *EPA v. Mink*, 410 U.S. 73, 79 (1979); and then quoting *Abramson*, 456 U.S. at 630).  "[T]hese limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act."  *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976).

FOIA authorizes federal courts to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant."  5 U.S.C. § 552(a)(4)(B).  District courts must "determine *de novo* whether non-disclosure was

6

permissible." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 522 (D.C. Cir. 2015). "FOIA places the burden 'on the agency to sustain its action,' and the agency therefore bears the burden of proving that it has not 'improperly' withheld the requested records." *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 922 F.3d 480, 487 (D.C. Cir. 2019) (citations omitted) (first quoting 5 U.S.C. § 552(a)(4)(B); and then quoting *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989)); *see also U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 171 (1993) (noting that "[t]he Government bears the burden of establishing that the exemption applies"). This burden does not shift even when the requester files a cross-motion for summary judgment because "the Government 'ultimately [has] the onus of proving that the [documents] are exempt from disclosure,'" while the "burden upon the requester is merely 'to establish the absence of material factual issues before a summary disposition of the case could permissibly occur.'" *Pub. Citizen Health Research Grp. v. FDA*, 185 F.3d 898, 904–05 (D.C. Cir. 1999) (alterations in original) (quoting *Nat'l Ass'n of Gov't Emps. v. Campbell*, 593 F.2d 1023, 1027 (D.C. Cir. 1978)).[2]

---

[2] The FBI points out that "each fact" claimed in its Statement of Material Facts should be treated "as conceded" because plaintiffs failed to controvert the alleged facts in an opposing statement, as required by this Court's local rules. Gov't's Opp'n Pls.' Cross-Mot & Reply Supp. Gov't's Mot. ("Gov't Opp'n") at 1 n.2, ECF No. 28 (citing LCvR 7(h)(1)). Indeed, a party ignores at its peril the requirements of applicable procedural rules, particularly FEDERAL RULE OF CIVIL PROCEDURE 56(e)(2) and LCvR 7(h)(1), which are intended to ensure clarity as to disputed issues. *See Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 & n.8 (D.C. Cir. 2013) (treating as conceded agency's statement of facts in FOIA suit when plaintiff "never contested any of those factual descriptions") (citing *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051, 1054 n.7 (D.C. Cir. 1981) ("Because [the appellant] did not contest the Government's [factual] assertions[,] . . . Rule 56(e) of the Federal Rules of Civil Procedure requires this court to take the Government's assertions as true. . . . In other words, failure to raise a genuine issue as to a material fact constitutes a concession that the uncontested fact is true for purposes of summary judgment.")) and *Malik v. District of Columbia*, 574 F.3d 781, 783 n.1 (D.C. Cir. 2009)). At the same time, "the District Court 'must always determine for itself whether the record and any undisputed material facts justify granting summary judgment,'" *Figueroa v. Pompeo*, 923 F.3d 1078, 1095 (D.C. Cir. 2019) (quoting *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016)).

## III.    DISCUSSION

FOIA Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  Two conditions must be met for a record to qualify for this exemption: (1) "its source must be a Government agency;" and (2) "it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it."  *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8, (2001); *see also Nat'l Inst. of Military Justice v. U.S. Dep't of Def. ("NIMJ")*, 512 F.3d 677, 682 (D.C. Cir. 2008); *Stolt-Nielsen Transp. Grp. LTD. v. United States*, 534 F.3d 728, 733 (D.C. Cir. 2008).  The Supreme Court has made clear that "the first condition of Exemption 5 is no less important than the second; the communication must be 'inter-agency or intra-agency.'"  *Klamath,* 532 U.S. at 9 (quoting 5 U.S.C. § 552(b)(5)).  The second condition "covers the presidential communications privilege, the deliberative process privilege, and the attorney-client privilege."  *Judicial Watch*, 913 F.3d at 1109; *see also Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015).  Here, the parties dispute whether the two conditions for invocation of Exemption 5 are satisfied for withholding of the SBI File.

For its part, the FBI justifies the withholding of the SBI File based on the presidential communications privilege, which is "a 'presumptive privilege for [p]residential communications.'"  *Loving v. Dep't of Defense*, 550 F.3d 32, 37 (D.C. Cir. 2008) (alteration in original) (quoting *United States v. Nixon*, 418 U.S. 683, 708 (1974)).  The FBI contends this privilege "squarely" applies because the SBI—and therefore the SBI File—was solicited by the White House Counsel's Office in the service of a core, nondelegable presidential function, namely, the appointment of a Supreme Court Justice, and, further, the privilege remains intact,

without the need for personal invocation by the President and despite the furnishing of the file to

the Senate Judiciary Committee.  *See generally* Gov't's Mem. Pts. Auth. Supp. Mot. Summ. J.

("Gov't Mem."), ECF No. 23-1; Gov't's Opp'n.

Plaintiffs, on the other hand, broadly argue that FOIA's Exemption 5 should not be

construed to encompass the presidential communications privilege.  Pls.' Opp'n at 7–10.

Further, if the presidential communications privilege could be the basis for withholding under

Exemption 5, plaintiffs contend the privilege is inapplicable here for four reasons: (1) "the

President did not request or consider the SBI for his own presidential decision-making, but

instead did so only at the request of the Senate … to facilitate the Senate's own Constitutionally

separate decision-making,"  Pls.' Reply at 3; *see also* Pls.' Opp'n at 3–5; (2) the FBI has not

established that portions of the file were ever received by the White House Counsel's Office,

those portions do not qualify for the privilege,  Pls.' Opp'n at 7; (3) the privilege was waived

when the White House shared the SBI File with the Senate Judiciary Committee, which publicly

released a summary of the file, *id*. at 5–6; and (4) use of the privilege requires the President's

personal invocation, which is absent here, *id*. at 7.

The FBI has the better arguments, for the reasons explained below.

### A.   PRESIDENTIAL COMMUNICATIONS PRIVILEGE APPLIES TO SBI FILE

Plaintiffs' argument that Exemption 5 does not encompass the presidential

communications privilege is predicated on a textual interpretation of the term "intra-agency

memorandums" more stringent than current D.C. Circuit precedent allows.  Following review of

that argument, analysis of the scope of this privilege demonstrates that the FBI has properly

applied the privilege to the SBI File.

1.      ***Exemption 5's "Inter-Agency or Intra-Agency" Records Requirement Encompasses the Presidential Communications Privilege***

Exemption 5's first condition of "inter-agency or intra-agency memorandums" cannot be met, in plaintiffs' view, by communications between an agency and the President (or the President's advisors) since the latter do not qualify as an agency within the meaning of FOIA. Pls.' Opp'n at 7–8.  To be sure, FOIA applies only to federal agencies and "Congress did not intend the word 'agency' to include the President, his 'immediate personal staff[,] or units in the Executive Office whose sole function is to advise and assist the President.'" *Judicial Watch, Inc. v. United States Secret Serv.*, 726 F.3d at 216 (quoting *Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136, 156 (1980)) (internal quotations and citation omitted) (alterations in original).

Yet, "[n]either Exemption 5 nor the cases interpreting it distinguish between the decision-making activities of an 'agency' subject to the FOIA and those of the President and his staff, who are not subject to the FOIA." *Judicial Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 129 (D.C. Cir. 2005).  Instead, as the D.C. Circuit has explained, "the Supreme Court [has] deemed it 'beyond question' that documents prepared by agency officials to advise the President were within the coverage of Exemption 5 because they were '"intra-agency" or "inter-agency" memoranda or 'letters' that were used in the decisionmaking processes of the Executive Branch." *Id.* (quoting *Mink*, 410 U.S. at 85).  For this reason, the D.C. Circuit has consistently viewed Exemption 5 as covering the presidential communications privilege, among other privileges. *See, e.g.*, *Judicial Watch*, 913 F.3d at 1108 ("memoranda responsive to [plaintiff's] FOIA request are protected from disclosure under the presidential communications privilege in Exemption 5"); *Citizens for Responsibility and Ethics in Wash. v. U.S. Dep't of Homeland Security ("CREW")*, 532 F.3d 860, 868 (D.C. Cir. 2008) (collecting cases and explaining that

10

"invocation of the presidential communications privilege in FOIA cases is a routine

occurrence"); *Loving*, 550 F.3d at 37 ("Exemption 5 'incorporates the traditional privileges that

the Government could assert in civil litigation against a private litigant'—including the

presidential communications privilege…" (quoting *Baker & Hostetler LLP v. U.S. Dep't of*

*Commerce*, 473 F.3d 312, 321 (D.C. Cir. 2006)); *Judicial Watch*, 365 F.3d at 1112 (explaining

that Exemption 5 contains "a built-in presidential communications privilege for records in the

possession of, or created by, immediate White House advisors, who are not considered an agency

for the purposes of FOIA.").

In the face of this binding precedent cementing the "routine" incorporation of the

presidential communications privilege into Exemption 5, *CREW*, 532 F.3d at 867, plaintiffs rely

on *Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356, 2363–64 (2019), in which

the Supreme Court rejected a "competitive harm" test unsupported by the text of Exemption 4, to

argue that "policy reasons are irrelevant in light of the plain text of the statute limiting the

exemption to "inter-agency or intra-agency" records," Pls.' Opp'n at 10.  Plaintiffs reliance on

*Argus Leader* is misplaced.  After all, to qualify as an "intra-agency memorandum[]," a

document's "source must be a Government agency," *Klamath*, 532 U.S. at 8, and here the SBI

File consists of email communications, FD-302s, interview notes, and administrative notes either

exchanged with or created by FBI agents, and compiled within the agency before subsequently

being sent to the White House Counsel's Office.  In essence, then, plaintiffs' position is that the

transmittal of the SBI File to the White House Counsel's Office, a non-agency government

entity, stripped these records of protection under Exemption 5.

To the extent plaintiffs believe that *Argus Leader* requires new attention to the text of

Exemption 5's first condition of an inter- or intra-agency communication, binding precedent in

this circuit again dictates the result.  To begin, in *Klamath,* the Supreme Court considered whether documents submitted by a non-agency to an agency can nonetheless qualify as "intra-agency memorandums" for Exemption 5 purposes, and concluded that records submitted to an agency by an outside entity, not for the purpose of "truth and its sense of what good judgment calls for … as an employee would be expected to do," 532 U.S. at 11, but instead to communicate its "own, albeit entirely legitimate interests," *id*. at 12, do not qualify, *id*. at 14–16. While the Supreme Court left open the broader question whether "communications between Government agencies and outside consultants hired by them" may qualify as "intra-agency memorandums," *id*. at 10, the D.C. Circuit has continued, post-*Klamath*, to apply its functional approach to find that communications between agencies and outside, or non-agency, entities may indeed meet the first statutory condition of Exemption 5.  *See, e.g., Pub. Emps. for Env't'l. Responsibility v. United States Section, Int'l Boundary & Water Comm'n*, 740 F.3d 195, 201 (D.C. Cir. 2014) ("this Court has also interpreted the phrase 'intra-agency' in Exemption 5 to go beyond the text and include U.S. agency records authored by *non*-agency entities if those records were solicited by a U.S. agency in the course of its deliberative process") (italics in original); *McKinley v. Board of Governors of the Federal Reserve System*, 647 F.3d 331, 336–39 (D.C. Cir. 2011) (finding records submitted to Board of Governors of the Federal Reserve System by a non-agency reserve bank qualified as an intra-agency communication under Exemption 5); *NIMJ*, 512 F.3d at 680 (D.C. Cir. 2008) ("our Circuit precedent interprets 'intra-agency' to include agency records containing comments solicited from non-governmental parties such as the lawyers whose counsel DoD sought—and, more to the point, our precedent is not inconsistent with *Klamath*.").  In so doing, the D.C. Circuit has cited approvingly pre-*Klamath* decisions in which submissions to agencies from non-agency government entities, such as

Senators and former Presidents, were accorded Exemption 5 protection.  *See, e.g., NIMJ,* 512 F.3d at 680 (discussing *Ryan v. Dep't of Justice,* 617 F.2d 781 (D.C. Cir. 1980) (holding that documents submitted by United States senators in response to Department of Justice questionnaire about procedures for selecting and recommending potential judicial nominees were exempt from FOIA disclosure under Exemption 5)); *id*. at 681 (discussing *Formaldehyde Inst. v. Dep't of Health & Human Servs.*, 889 F.2d 1118 (D.C. Cir. 1989) (holding that Exemption 5 protected comments by private referees for the American Journal of Epidemiology regarding a report submitted for publication by an employee of the Centers for Disease Control); *id.* at 681 (discussing *Public Citizen, Inc. v. Dep't of Justice,* 111 F.3d 168 (D.C. Cir. 1997) (holding that communications among former President Reagan, the National Archives and the Department of Justice and among former President Bush and the same agencies regarding electronic records of each of the two Presidents' administrations qualify "intra-agency" for purposes of Exemption 5)).[3]

Most relevant here, the D.C. Circuit, post-*Klamath*, in *Judicial Watch, Inc. v. Department of Energy*, concluded that agency communications with a non-agency government entity, the National Energy Policy Development Group (NEPDG), created and tasked by the President to provide him with advice and assistance, were "intra-agency" communications even though

---

[3]    Judge Tatel vigorously dissented in *NIMJ*, criticizing the majority's holding that "our earlier cases 'compel us to conclude that documents . . . submitted by non-agency parties in response to an agency's request for advice are covered by Exemption 5," *NIMJ*, 512 F.3d at 692 (Tatel, J., dissenting) (quoting *NIMJ*, 512 F.3d at 681), because that holding "disregards the Supreme Court's command that FOIA exemptions be narrowly construed," *id*. at 694, and "contravenes *Klamath,*" *id.* at 696, by redefining and stretching the meaning of "intra-agency" rather than giving the term "independent vitality," as *Klamath* instructed.  In his view, "*Klamath* eviscerates the reasoning in the *Ryan* [*v. DOJ*, 617 F.2d 781 (D.C. Cir. 1980)] line of cases," including *Formaldehyde Institute v. Department of Health & Human Services,* 889 F.2d 1118 (D.C. Cir. 1989), and *Public Citizen, Inc. v. DOJ,* 111 F.3d 168 (D.C. Cir. 1997). He reiterated these concerns, in concurring in the denial of rehearing en banc, explaining "despite my serious misgivings about the continuing validity of our 'intra-agency' decisions in the *post-Klamath* era, because *Klamath* does not squarely address the question of when outside experts qualify as 'intra-agency,' I see little point in this court spending more time on the issue.  Only the Supreme Court can clarify the outer limits of the 'intra-agency' prong of Exemption 5."  *Nat'l Inst. Military Justice v. Dep't of Defense*, No. 06-5242, 2008 WL 1990366, at *2 (D.C. Cir. Apr. 30, 2008) (Tatel, J., concurring).

the President and his immediate staff are not an "agency" within the meaning of FOIA.  412 F.3d

125, 130–31 (D.C. Cir. 2005).  The court expressly rejected the view that this "interpretation of

Exemption 5" is inconsistent "with its textual limitation to 'intra-agency' or 'inter-agency'

communications," explaining "[r]ather, it follows from the principle, well established in this

circuit, that a document need not be created by an agency or remain in the possession of the

agency in order to qualify as 'intra-agency.'"  *Id*. at 130.  This holding recognized "the basic

need of the President and his White House staff to monitor the consistency of executive agency

regulations with Administration policy," and to "be briefed fully and frequently about rules in

the making, and their contributions to policymaking considered."  *Id.* at 130 (internal quotations

and citation omitted)).  "[W]hat matters," the Court held, "is whether a document will expose the

pre-decisional and deliberative processes of the Executive Branch."  *Id.* at 131.

In short, binding D.C. Circuit precedent compels the conclusion that Exemption 5

encompasses the presidential communications privilege and the finding that the SBI File, itself a

communication between the FBI and the President and containing additional such

communications, constitutes "intra-agency memorandums or letters" under FOIA Exemption 5.

## 2.   *Presidential Communications Privilege Covers the SBI File*

The presidential communications privilege "protects 'communications directly involving

and documents actually viewed by the President,' as well as documents 'solicited and received'

by the President or his 'immediate White House advisers [with] … broad and significant

responsibility for investigating and formulating the advice to be given the President.'"  *Loving*,

550 F.3d at 37 (alteration in original) (quoting *Judicial Watch*, 365 F.3d at 1114).  As the D.C.

Circuit has explained, "[t]he privilege covers documents reflecting 'presidential decisionmaking

and deliberations,' regardless of whether the documents are predecisional or not, and it covers

the documents in their entirety." *Id*. at 37–38 (quoting *In re Sealed Case*, 121 F.3d 729, 744–45 (D.C. Cir. 1997)).

The purpose of the privilege is to "preserve[] the President's ability to obtain candid and informed opinions from his advisors and to make decisions confidentially." *Id*. at 37. As such, the privilege protects "the need for confidentiality to ensure that presidential decision-making is of the highest caliber," *In re Sealed Case*, 121 F.3d at 750, so that the President may "effectively and faithfully carry out his Article II duties and 'to protect the effectiveness of the executive decision-making process,'" *Judicial Watch*, 365 F.3d at 1115 (quoting *In re Sealed Case*, 121 F.3d at 742) (internal quotation marks omitted). The privilege is "'fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution' because it 'relates to the effective discharge of a President's powers.'" *Judicial Watch*, 913 F.3d at 1110 (quoting *Nixon*, 418 U.S. at 708); *see also In re Sealed Case*, 121 F.3d at 745 (describing the presidential communications privilege as "rooted in constitutional separation of powers principles and the President's unique constitutional role.").

In *Loving*, the D.C. Circuit held that a set of records "concerning the general procedures for transmitting military death penalty cases to the President" were exempt from FOIA under Exemption 5 and the presidential communications privilege. 550 F.3d at 36. Two of these records were "memoranda from the Army and Defense Secretaries directly to the President advising him on his [Uniform Code of Military Justice] Article 71(a) review of [the plaintiff's] capital sentence." *Id*. at 39. "Such memoranda," the Circuit concluded, "fall squarely within the presidential communications privilege because they 'directly involve' the President, and their confidentiality 'ensure[s] that presidential decision-making is of the highest caliber, informed by honest advice and full knowledge.'" *Id*. at 39 (alteration in original) (quoting *Judicial Watch*, 365

F.3d at 1114 and *In re Sealed Case*, 121 F.3d at 750).  A third document—"the Judge Advocate General's recommendation on Loving's [the plaintiff's] capital sentence"—was not addressed directly to the President but was instead "forwarded by the Army Secretary to the President."  *Id.* at 40.  This document was also privileged, the Circuit held, because "the President solicited and received [it] in a manner sufficient to bring it within the presidential communications privilege," and it "d[id] not lose its privileged status simply because it traveled up the chain of command before the President received it."  *Id.*

The presidential communications privilege applies for similar reasons in this case.  To begin, the SBI File was "solicited and received" by "immediate White House advisers" with "broad and significant responsibility for investigating and formulating … advice to be given the President."  *Loving*, 550 F.3d at 37; *Judicial Watch*, 365 F.3d at 1114.  Under the 2010 MOU, "[r]equests for FBI background investigations and name checks of Appointees" must be made by the President "or an official who has been designated in writing to make such requests."  2010 MOU ¶ 3(a).  In this case, the "President designated the White House Counsel to request [an] initial full-field background investigation of then-Judge Kavanaugh."  Hardy Decl. ¶ 55.  In September 2018, "an authorized official within the White House Counsel's Office" then "sent a series of emails to the FBI on behalf of the President soliciting [a] follow-up inquiry, also known as the supplemental background investigation, which is at issue in this litigation."  *Id.* ¶ 56.  The 2010 MOU requires that the results of any such investigation be reported back to the President or his designated official.  *See* 2010 MOU ¶¶ 4(a)–(e).

Here, in conformity with this procedure, "the FBI incrementally faxed the entire supplemental background investigation file … to the White House Counsel's Office, with the potential exception of the FBI agents' hand-written interview notes and a small number of

administrative note pages."  Hardy Decl. ¶ 59.  Thus, the SBI File was plainly "solicited and received" by the White House Counsel's Office, meeting that aspect of the presidential communications privilege's requirements.[4]

Meanwhile, the SBI was requested to assist the President "effectively and faithfully carry out his Article II duties," in line with the overarching purpose of the privilege.  *Judicial Watch*, 365 F.3d at 1115.  As the government points out, the appointment of Supreme Court justices is a core, nondelegable presidential duty specifically enumerated in Article II of the Constitution.  Gov't's Mem. at 17–18.  The critical importance of this function also presents a heightened "need for confidentiality to ensure that presidential decision-making is of the highest caliber," *In re Sealed Case*, 121, F.3d at 750, which the privilege is designed to provide.  Indeed, the White House Counsel's Office specifically communicated to the FBI "that the disclosure of the [SBI File] would inhibit the President's ability to engage in effective communications and decision-making by interfering with the ability of the President to seek and obtain candid information."  Hardy Decl. ¶ 62.

Accordingly, the SBI File is protected by the presidential communications privilege under Exemption 5.

### B.    PLAINTIFF'S FACTUAL CHALLENGES TO APPLICATION OF PRESIDENTIAL COMMUNICATIONS PRIVILEGE FAIL

Plaintiffs contend that, even if Exemption 5 encompasses the presidential communications privilege, this privilege does not properly apply here because the SBI did not serve presidential decision-making.  Pls.' Reply at 2 ("this particular background investigation had no part in any protected presidential decision-making process").  To bolster this point,

---

[4]       Plaintiffs' specific challenge to withholding of the hand-written interview notes and administrative note pages, which the FBI cannot confirm were transmitted to the White House Counsel's Office, is addressed, *infra,* in Section III.D.

plaintiffs raise two factual challenges.  First, plaintiffs highlight that the SBI was instigated at the request of the Senate Judiciary Committee.  *Id*. at 2 (noting Republican Senator Jeff Flake's vote "to advance the Kavanaugh nomination with the understanding that FBI would conduct a supplemental background investigation"); Pls.' Statement of Material Facts Supp. Pls.' Mot. ("Pls.' SOF"), at ¶¶ 1, 3, ECF No. 25-2.  In addition, plaintiffs point to the President's own statements expressing his intention of continuing with the nomination before the results of the SBI were known.  *See* Pls.' Reply at 3 ("At the time he announced the SBI that the Senate requested, the President stated that Judge Kavanaugh 'will someday be recognized as a truly great Justice of The United States Supreme Court!'"); *id*. at 3 ("When asked on September 28, 2018, whether he had thought about a replacement for Judge Kavanaugh, the President stated: 'Not even a little bit.'").  Irrespective of the political dynamics that prompted the President to request the SBI, as authorized under the 2010 MOU, *see id*. ¶ 3.d (referencing "[r]equests for supplemental inquiries… while an Appointee's confirmation is pending will be presumed to be within the ambit of the original consent"), and despite the President's public statements, the presidential communications privilege applies.[5]

---

[5]     Plaintiffs also challenge the sufficiency of the Hardy Declaration, as "improperly vague" and "lack[ing] in foundation" to support application of the presidential communications privilege since the affiant is an FBI employee and no White House official submitted an affidavit regarding invocation of this privilege.  Pls.' Opp'n at 4.  The Court disagrees.  Certainly, Federal Rule of Civil Procedure 56 requires factual positions to be supported by adequate materials in the record, with specific requirements for factual matters presented in affidavits or declarations.  *See* FED. R. CIV. P. 56(c)(4) ( "An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").  In FOIA cases, an agency declarant need not have been personally involved in the events reflected in, or preparation of, the records at issue but merely have personally been advised about or reviewed those records to meet the Rule 56 standard.  *See, e.g., SafeCard Servs., Inc. v. S.E.C.*, 926 F.2d 1197, 1201 (D.C. Cir. 1991) (finding that agency affiant "in charge of coordinating the agency's search and recovery efforts" was "the most appropriate person to provide a comprehensive affidavit" since "an agency employee responsible for supervising [the] search" may make such a declaration, even if in doing so he or she "necessarily reli[es] upon information provided by staff members who actually performed [the] search."); *Meeropol v. Meese*, 790 F.2d 942, 951 (D.C. Cir. 1986) (accepting affidavit by agency employee who "had supervised the search of all the main files at FBI Headquarters…"); *Prop. of the People, Inc., et al. v. Dep't of Justice*, 405 F. Supp. 3d 99, 125 (D.D.C. 2019) (approving agency declaration "based upon [employee's] personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations

First, even if activity on the Senate Judiciary Committee prompted the SBI, the White House Counsel's Office, not the Committee, actually "solicited" the SBI in connection with the nomination of a Supreme Court Justice, pursuant to the 2010 MOU, and thus this request was made in the service of a nondelegable presidential duty.  The President's September 28, 2018 tweet cited by plaintiffs, *see* Pls.' Reply at 3, stating that the SBI would be "limited in scope and completed in less than one week," "[a]s the Senate has requested," only confirms that the President, not the Senate, "ordered the FBI to conduct" the investigation," Gov't's Resp. to Pls.' SOF ("Gov't's Resp. Pls' SOF"), at ¶ 2, ECF No. 29-1.  The plaintiffs concede as much. Pls.' Opp'n at 2 (conceding that "the President ordered the FBI to conduct [the] SBI.").  Nor could the Senate have ordered the SBI since the FBI conducts background investigations into potential judicial nominees pursuant to the 2010 MOU, which restricts the agency to undertaking such investigations only at the request of the President or an official designated by the President. Hardy Decl. ¶ 52; Gov't's Opp'n at 5 ("[t]here is no similar agreement authorizing the Senate to request—much less force—the FBI to conduct a background investigation of a judicial nominee selected by the President.").

---

reached and made in accordance therewith."); *Wisdom v. United States Trustee Program*, 232 F. Supp. 3d 97, 115–16 (D.D.C. 2017) (accepting agency affidavit based on "information provided to [the affiant] by other agency employees and his own review of agency records."); *Hainey v. U.S. Dep't of the Interior*, 925 F. Supp. 2d 34, 41 (D.D.C. 2013) ("[I]t is well settled that FOIA declarants may include statements in their declarations based on information they have obtained in the course of their official duties." (internal citation and quotation marks omitted)).  Here, the records at issue are created and retained by the FBI and subject to the 2010 MOU, to which the FBI is a party.  *See, e.g.,* 2010 MOU ¶ 5.d. ("Information obtained during an investigation will be retained at FBI Headquarters and FBI field offices in accordance with the FBI's Privacy Act records systems notices, Records Retention Plan, and Disposition Schedule.").  Consequently, an FBI affiant is an appropriate person with knowledge of the facts relevant to evaluating application of FOIA Exemption 5.  *Cf. Lardner v. U.S. Dep't of Justice*, No. Civ. 03-0180 (JDB), 2005 WL 758267, at *9–10 (D.D.C. Mar. 31, 2005) (relying for application of presidential communications privilege to records requested regarding presidential pardons on affidavit of an attorney-advisor in the Office of the Pardon Attorney in the U.S. Department of Justice).  The agency affiant, David Hardy, as the Section Chief of the FBI's Record/Information Dissemination Section, supervises the section with the "mission [] to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA,"  Hardy Decl. ¶ 2, and his declaration is "based on [his] personal knowledge, upon information provided to [him] in [his] official capacity, and upon conclusions and determinations reached and made in accordance therewith," *id*.  As such, the Hardy Declaration adequately meets the Rule 56 standard.

Plaintiffs counter that "the mere fact that the President issued the order to the FBI to conduct the investigation … does not mean that he did so for the purpose of presidential decision-making, which is the relevant question," when here "the investigation was conducted to assist the Senate in its decision whether to consent to the nomination, …. and [] the scope and timing of the investigation came from the Senate, not the President, other than in the most superficial and irrelevant sense."  Pls. Reply at 4.  Irrespective of the plausibility of plaintiffs' view of the facts, the result of this factual challenge would have this Court drill down into the White House's motivations for making the request for the SBI and then assess whether and how much political pressure—from another branch of the Federal government, particular members of Congress, the public or whatever source—was brought to bear to prompt the presidential action, all as a prerequisite to evaluating the role the SBI File played in the President's decision to support the Supreme Court nominee.  Even if a court were equipped to test the motivations for a specific presidential action in a dynamic political context, doing so would turn the whole point of the presidential communications privilege on its head by undermining the President's ability to "make decisions confidentially."  *Loving*, 550 F.3d at 37.  This Court declines to proceed down this proverbial rabbit hole.

Second, the President's statements publicly touting his nominee and even eschewing the need for the SBI do not undermine application of the presidential communications privilege. These statements did not preclude the possibility that the results of the SBI might or could have altered his view.  The FBI concedes that, on September 28, 2018, when announcing the SBI, the President tweeted that Brett Kavanaugh would "someday be recognized as a truly great Justice of The United States Supreme Court!", but expressly denies the conclusion drawn by plaintiffs, that "the President was not reconsidering the nomination and did not request the SBI for the purposes

of his own decision-making."  Gov't's Resp. Pls' SOF, ¶ 4.  Public statements indicating

continued support do not necessarily reflect what occurred behind closed White House doors or

forestall alternate positions or outcomes, and such statements hardly establish, over the agency's

sworn statements to the contrary, *see* Hardy Decl. ¶ 62, that the purpose of the investigation was

not to aid in the administration's decision-making process regarding the nomination.

In sum, the FBI, through the Hardy Declaration, has met its burden in showing that the

SBI was solicited in the service of presidential decision-making.  Conversely, the plaintiffs have

not undermined the FBI's agency declaration or demonstrated, with reference to equivocal social

media statements, that the SBI bore no relation to actual presidential decision-making.

### C.   PRESIDENTIAL COMMUNICATIONS PRIVILEGE WAS NOT WAIVED

Plaintiffs contend that, even if the presidential communications privilege applies to the

SBI File, the loan of that file to the Senate Judiciary Committee, which subsequently published a

summary on its website, waived any privilege.  *See* Pls.' Opp'n at 5–6.  This argument fails in

the face of binding D.C. Circuit precedent that sharing privileged material with Congress does

not constitute waiver in the context of FOIA's Exemption 5.

The D.C. Circuit addressed directly in *Murphy v. Department of the Army*, 613 F.2d

1151, 1152 (D.C. Cir. 1979), "whether the deliberative process privilege encompassed in

Exemption Five of the Act (5 U.S.C. s 552(b)(5)) was waived when the documents sought by

appellant were disclosed to a Member of Congress."  In that case, "[n]o specific request was

made" that the Member of Congress, who received the disclosure, "keep the document

confidential," *id.* at 1158, but the Circuit nonetheless found "evident" that the disclosure did not

waive the privilege, *id*. at 1155.

Likewise, in *Rockwell International Corporation v. United States Department of Justice*,

235 F.3d 598, 604 (D.C. Cir. 2001), the Circuit noted *Murphy*'s holding "that the Army had not

waived Exemption 5 protection for an internal legal memorandum by sending it to a congressman along with a letter," and reaffirmed that disclosure to Congress did not constitute waiver.  In rejecting the argument that documents withheld under Exemption 5 but shared with Congress should not be entitled to privilege, *id.* at 601, the Circuit explained that "since under such an interpretation every disclosure to Congress would be tantamount to a waiver of all privileges and exemptions, executive agencies would inevitably become more cautious in furnishing sensitive information to the legislative branch—a development at odds with public policy which encourages brought congressional access to governmental information," *id.* at 604 (quoting *Murphy*, 613 F.2d at 1156 (footnote omitted)).

Pointing out that these precedents dealt with the deliberative process privilege rather than the presidential communications privilege, plaintiffs argue these cases are distinguishable.  Pls.' Opp'n at 5–6.  Plaintiffs' effort to set aside these binding precedents is expressly foreclosed, however.  The Circuit has made clear that: "If release to a congressional body of a document exempt from disclosure under the FOIA does not amount to a waiver of the governmental privilege, it makes conceptually no difference whether the underlying exemption provision relates to law enforcement, to the government's internal deliberative processes, or to some other privileged activity."  *Murphy*, 613 F.2d at 1157 n.16.

Indeed, the reasoning relied upon in both *Murphy* and *Rockwell* applies equally to the presidential communications privilege.  In both cases, the Circuit emphasized the FOIA provision providing that "[t]his section is not authority to withhold information from Congress." *Rockwell*, 235 F.3d at 604 (quoting 5 U.S.C. § 552(d)).  "If 'disclosure of information to Congress [were] disclosure to the whole world,' … it would be 'inconsistent with the obvious purpose of the Congress [in 552(d)] to carve out for itself a special right of access to privileged

information,' and would 'effectively transform section [552(d)] into a congressional declassification scheme, a result supported neither by the legislative history of the Act, nor by general legal principles or common sense.'" *Id*. (quoting *Murphy*, 613 F.2d at 1155–56 (footnotes omitted) (alterations in original)).  This logic applies with equal force to material withheld under the presidential communications privilege.  So too does the broader policy concern that a rule construing the sharing of privileged material with Congress as a waiver of privilege would inevitably discourage "'broad congressional access to governmental information.'"  *Id*. (quoting *Murphy*, 613 F.2d at 1156).

Thus, applying *Rockwell* and *Murphy*, when the White House Counsel's Office shared the SBI File with the Senate Judiciary Committee on October 4, 2018, *see* Hardy Decl. ¶ 61, no waiver of privilege under Exemption 5 occurred.

In a last gasp effort to establish waiver, plaintiffs further contend that the Senate Judiciary Committee's release, on October 4, 2018, of an executive summary of the SBI File constituted waiver, "at least as to the same information." Pls.' Opp'n at 6; Pls.' SOF ¶ 13; *see also* Gov't's Resp. Pls.' SOF ¶ 13(a) (acknowledging that Senate Judiciary Committee "released a press release titled 'Supplemental FBI Investigation Executive Summary,' which purported to identify people interviewed as part of the SBI.").  Privilege waiver is not so straightforwardly simple as plaintiffs suggest, however.

"[W]hen information has been 'officially acknowledged,' its disclosure may be compelled even over an agency's otherwise valid exemption claim."  *Wolf v. C.I.A.*, 473 F.3d 370, 378 (D.C. Cir. 2007) (quoting *Fitzgibbon v. C.I.A.*, 911 F.2d 755, 765 (D.C. Cir. 1990)).  Yet an "official acknowledgement" is only recognized when: (1) "the information requested [is] as specific as the information previously released; (2) "the information requested [] match[es] the

information previously disclosed"; and (3) "the information requested … [was] made public through an official and documented disclosure." *Id.* (quoting *Fitzgibbon*, 911 F.2d at 765). In this context, "[t]he plaintiff bears the burden of identifying specific information that is already in the public domain due to official disclosure." *Mobley v. C.I.A.*, 806 F.3d 568, 583 (D.C. Cir. 2015) (citing *Wolf*, 473 F.3d at 378; *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983).

Here, plaintiffs fail to meet this burden for two reasons. First, a simple math comparison between the 1.5-page executive summary released by the Senate Judiciary Committee and the 527-page SBI File significantly undermines any suggestion that the summary is "as specific as" or "match[es]" the File. Moreover, in substance, "[t]he executive summary consists of six sentences … followed by a bulleted list identifying six individuals who were purportedly interviewed." Gov't's Opp'n at 15. This is hardly enough, since "[p]rior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure." *Wolf*, 473 F.3d at 378 (italics in original).

Second, disclosure by Congress alone cannot result in a waiver of privilege because "we do not deem 'official' a disclosure made by someone other than the agency from which the information is being sought." *Frugone v. C.I.A.*, 169 F.3d 772, 774 (D.C. Cir. 1999). Thus, the D.C. Circuit has repeatedly confirmed that disclosure by Congress does not prevent the Executive Branch from asserting privilege to withhold records under FOIA. *See Fizgibbon*, 911 F.2d at 765–66 (revealing information in congressional committee report did not waive privilege under FOIA when information was not officially acknowledged); *Salisbury v. United States*, 690 F.2d 966, 971 (D.C. Cir. 1982) (discussing FOIA requested information in Senate report did not

waive privilege asserted by National Security Administration).  Accordingly, the Senate

Judiciary Committee's disclosure of an executive summary did not constitute waiver of any

extant Executive Branch privilege under FOIA's Exemption 5.

> ### D.   PRESIDENTIAL COMMUNICATIONS PRIVILEGE APPLIES TO SBI FILE IN FULL

Plaintiffs assert that the presidential communications privilege should not apply to

withhold parts of the SBI File for which the FBI failed to show receipt by the President.  Pls.'

Opp'n at 7; *see* Hardy Decl. ¶ 59 (acknowledging that FBI was unable to confirm transmission to

the White House Counsel's Office of "the FBI agents' hand-written interview notes and a small

number of administrative note pages" in SBI File).  In the FBI's view, even if certain parts were

not sent to the White House, the privilege nonetheless applies because these parts contain

information reflected in other pages transferred to the White House Counsel's Office and fully

covered by the privilege.  Gov't Opp'n at 16–17; Gov't Mem. at 16–17.  In particular, the

FBI points out that the hand-written interview notes of the FBI agents were used to create the

FD-302s sent to the White House as part of the SBI File.  Consequently, the hand-written

interview notes "necessarily memorialize privileged communications," Gov't Opp'n at 17, and

"contain information that, if disclosed, would reveal privileged information contained in the

pages that were transmitted," *id.* at 16.

The government is correct.  FD-302s are "forms used by FBI agents to record

information which they obtain through witness interviews."  *Citizens for Responsibility & Ethics

in Wash. v. Dep't of Justice*, 746 F.3d 1082, 1089 (D.C. Cir. 2014) (internal citation omitted).

Thus, the agents' interview notes contain information reflected in the FD-302s in the SBI File,

which were "solicited and received" by the White House Counsel's Office, and, as such, are

similarly protected.  Recognizing the close linkage between agents' notes and the FD-302

derived from those notes is supported by other decisions from this Court concluding that the presidential communications privilege "extends to internal agency documents that memorialize privileged communications between the agency and President or immediate White House advisers." *Prop. of the People, Inc. v. Office of Mgmt. & Budget*, 330 F. Supp. 3d 373, 387 (D.D.C. 2018) (citing *Citizens for Responsibility & Ethics in Wash. v. Dep't of Homeland Security*, No. Civ. 06-0173 (RJL), 2008 WL 2872183 (D.D.C. July 22, 2008); *see also Protect Democracy Project, Inc. v. U.S. Nat'l Sec. Agency*, No. CV 17-1000 (CKK), 2020 WL 1331996, at *5 (D.D.C. Mar. 23, 2020) (finding that FOIA's Exemption 5 and the presidential communications privilege protected a memorandum "memorializ[ing] … advice solicited by, and provided to, the President that directly related to presidential decision-making…"). Similarly, the D.C. Circuit has not hesitated to cloak notes with the same presidential communications privilege applied to final recommendations sent to the President. *See In re Sealed Case*, 121 F.3d at 758 (applying privilege to memoranda "authored by the White House Counsel, Deputy White House Counsel, Chief of Staff and Press Secretary" that "were communications connected to an official matter on which they were directly advising the President," as well as to "notes taken of meetings … at which these advisers were present, since these notes reflect[ed] these advisers' communications").

Here, disclosing the agents' interview notes used to compose the privileged FD-302s would undermine the privilege by revealing sensitive information compiled in the service of presidential decision-making.  Similarly, disclosure of the administrative note pages that may or may not have been faxed to the White House Counsel's Office would "reveal privileged information contained in the [SBI] file."  Gov't's Opp'n at 17.  Forcing limited disclosure of materials underlying the SBI File would be especially anomalous in this context, since "the

presidential communications privilege applies to documents in their entirety." *In re Sealed Case*, 121 F.3d at 745; *see also Judicial Watch*, 365 F.3d at 1113–14 (restating this rule).  For these reasons, the privilege applies to the SBI File in full and covers those pages of hand-written interview notes and administrative notes containing information presented elsewhere in the File, even if the FBI is unable to establish that those notes were transmitted to the White House Counsel's Office.

### E.   PRESIDENT'S PERSONAL INVOCATION OF PRIVILEGE NOT REQUIRED

Finally, plaintiffs argue that personal invocation by the President is required to rely upon the presidential communications privilege and since no such invocation occurred here, this privilege is inapplicable.  Pls.' Opp'n at 7.  In making this argument, plaintiffs concede that they rely on "case law outside the FOIA context suggest[ing] that the President must personally assert the Constitutional privilege." *Id*; *id.* at 9 (citing *In re Sealed Case*, 121 F.3d at 745, n.16 (discussing but not deciding whether personal invocation is required to assert the presidential communications privilege outside of the FOIA context).  This argument is easily dispatched.

To qualify for withholding under Exemption 5, records "must fall within the ambit of a privilege against discovery," *Klamath*, 532 U.S. at 8, and not be "'routinely' or 'normally' disclosed upon a showing of relevance," *F.T.C. v. Grolier, Inc.*, 462 U.S. 19, 26 (1983) (quoting *NLRB v. Sears, Roebuck*, 421 U.S. 132, 148–49 (1975)).  Put another way, Exemption 5 privileges are "categorical," *id.* at 28, and "[a]n exemption analysis that yields a different outcome depending on the way in which a particular document is invoked draws FOIA away from the desired categorical approach," *Lardner v. U.S. Dep't of Justice*, No. Civ. 03-0180 (JDB), 2005 WL 758267, at *8 (D.D.C. Mar. 31, 2005).  The requirements for application of a privilege under Exemption 5 thus differ from those of the civil discovery context.  As the

Supreme Court has explained, "[i]t is not difficult to imagine litigation in which one party's need for otherwise privileged documents would be sufficient to override the privilege but that does not remove the documents from the category of the *normally* privileged." *Grolier*, 462 U.S. at 28 (italics in original).

A thorough analysis of the position put forward by plaintiffs here—that personal invocation of the presidential communications privilege should be imported into the FOIA analysis—was fully considered by Judge Bates in *Lardner v. Department of Justice*, and rejected "[f]or several reasons." 2020 WL 758267 at *7. These reasons include: (1) "'fall[ing] within the ambit' of the presidential communications privilege," as the Supreme Court in *Klamath* discussed, turns "on the *content or nature* of a document generally," and "not [] also on the *manner* in which the exemption is raised in a particular request," *id*. (emphasis in original); (2) nothing "in the text of the statute or elsewhere [indicates] that Congress anticipated—much less demanded—that the decision to withhold documents under Exemption 5 would need to be made personally by the head of the agency (in this case the President)," *id*. at *8; (3) relatedly, no other FOIA exemption operates that way, *id.*; (4) "requiring the President of the United States to personally examine the documents at issue and then invoke the presidential communications privilege every time a citizen seeks presidential records through FOIA would expose the President to a considerable burden," *id*. at *9;  (5) this burden would be exacerbated when FOIA requests "encompass documents from all past administrations,… [and] the President would have no familiarity," *id.*; and (6) "[t]he Court is unconvinced that Congress desired such a result" when "the legislative history of FOIA shows (and the Supreme Court has held) that Congress specifically intended the President of the United States and his immediate staff to be immune from FOIA requests," *id.* These considerations compelled the conclusion that

"Plaintiff's view finds no warrant in the statute, the legislative history, or legal precedent, and would chain the President to a stack of documents for review at the whim of a FOIA requestor." *Id*. at *10.

This Court agrees with the sound reasoning in *Lardner*, as have other Judges on this Court who have consistently rejected the argument that personal invocation is required to apply the presidential communications privilege in the context of Exemption 5. *See, e.g., Loving v. U.S. Dep't of Def.*, 496 F. Supp. 2d 101, 108 (D.D.C. 2007), *aff'd sub nom. Loving*, 550 F.3d at 32 ("personal invocation is not required as to FOIA requests."); *Elec. Privacy Info. Ctr. v. Dep't of Justice*, 584 F. Supp. 2d 65, 80 (D.D.C. 2008) ("There is no indication in the text of FOIA that the decision to withhold documents pursuant to Exemption 5 must be made by the President."); *Am. Ctr. for Law & Justice v. U.S. Dep't of State*, 330 F. Supp. 3d 293, 309 (D.D.C. 2018) ("'the presidential communications privilege does not need to be asserted by the President himself' in this [FOIA] case [concerning Exemption 5]") (quoting *Elec. Privacy Info. Ctr.*, 584 F. Supp. 2d at 80)).

Accordingly, personal invocation by the President of the presidential communications privilege is not required in the context of FOIA's Exemption 5.

## IV.    CONCLUSION

For the foregoing reasons, the FBI's motion for summary judgment is GRANTED and plaintiffs' cross-motion for summary judgment is DENIED.  An order consistent with this memorandum opinion will be entered contemporaneously.

Date: May 7, 2020

_____
BERYL A. HOWELL
Chief Judge